UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------X
ACBEL POLYTECH INC., individually      :
and as assignee of certain claims,        :
           :
                Plaintiff,     :      Civil Action No. 13-13046-DJC
           :
         v.           :
           :      **AMENDED COMPLAINT**
FAIRCHILD SEMICONDUCTOR      :
INTERNATIONAL, INC., and FAIRCHILD   :
SEMICONDUCTOR CORPORATION     :
           :
           Defendants.  :
           :
------------------------------------------------------------X

      Plaintiff, AcBel Polytech Inc. ("AcBel"), both in its own name and as an assignee

of EMC Corp., by its attorneys Becker, Glynn, Muffly, Chassin & Hosinski LLP and Foley &

Lardner LLP, alleges, as follows:

<u>Introduction</u>

    1.     AcBel, a Taiwanese company with its US facilities in Hopkinton, Massachusetts,

is a leading developer, manufacturer, and seller of power management solutions for high-end

computing products.  This is an action by AcBel against one of its microcircuit component part

suppliers, Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation

(together, "Fairchild").  Fairchild describes itself as a worldwide leader in the development and

manufacture of power analog, power discrete and certain non-power semiconductor solutions to

a wide range of end market customers.  This action arises out of a defect in a microcircuit

component part manufactured and designed by Fairchild—part KA7805ERTM (the "Voltage

Regulators").

2.      The Voltage Regulator is a component of a power supply unit designed and manufactured by AcBel, known as the Katina 400W General Assembly (the "PSU").  The PSU supplies a consistent stream of power in certain high-end data storage devices.

3.      In January 2010, Fairchild changed the design of its Voltage Regulators.  The newly designed Voltage Regulators contained a latent defect.  In the summer of 2010, one of Fairchild's customers experienced epidemic rates of failure in connection with the newly designed Voltage Regulators.  Fairchild concluded that the cause of the high rate of failure was a design defect.  As a result, Fairchild reverted back to the old design for all of its customers, including AcBel, in week 35 of 2010.

4.      Though aware that it had shipped AcBel several hundred thousand defective Voltage Regulators, Fairchild did not affirmatively disclose the defect to AcBel, and instead concealed the defect from AcBel.  And it did not disclose the reversion back to the old design, the custom in the industry whenever there is a design or process change in a microcircuit component.  Disclosure of the change might have alerted AcBel to the fact that there was a problem.  Instead, Fairchild hid the change and defect, with the result that AcBel continued to incorporate the defective Voltage Regulators into its PSUs.

5.      The PSUs at issue were specially designed for EMC, one of AcBel's primary customers.  EMC is a leading manufacturer of high-end storage devices and provider of cloud computing services, with its corporate headquarters located in Hopkinton, Massachusetts.  The request for AcBel to manufacture and design the PSUs originated from EMC in Massachusetts.  The PSUs served as the power supply for storage units (known as Disk Array Enclosures or DAEs) manufactured by EMC.  DAEs are like giant hard drives, and store immense quantities of data.  They are typically purchased by large institutional customers.

2

6.      In December 2010, the PSUs began to fail at epidemic rates.  After running a battery of tests, EMC and AcBel, working together in Massachusetts, traced the problem to the Fairchild Voltage Regulator.  On December 9, 2010, Fairchild confessed that its new Voltage Regulators suffered from a design defect and that it had reverted back to the old design in week 35 of 2010, all without disclosure to AcBel.

7.      As a consequence of both the defect and Fairchild's fraudulent concealment, approximately 200,000 PSUs were built with the defective Voltage Regulator component.  As a consequence of Fairchild's concealment and failure to timely disclose the defect to AcBel, many of those PSUs were deployed in the field.  Fairchild's attempt to conceal the defect greatly increased the harm; servicing a PSU in the field is exponentially more expensive than servicing a PSU in inventory.

8.      AcBel and EMC have already incurred costs approaching $30 million for servicing the PSUs containing the defective Voltage Regulators.

Parties, Jurisdiction and Venue

9.      AcBel is organized under the laws of Taiwan, the Republic of China and its principal place of business is in Taiwan.

10.     Fairchild Semiconductor International is, upon information and belief, a publicly traded holding company organized under the laws of Delaware.  Its principal operating subsidiary, Fairchild Semiconductor Corporation, is also organized under the laws of Delaware. Fairchild's principal place of business under 28 U.S.C § 1332—the so-called nerve-center—is in California. Fairchild has a major corporate office in South Portland, Maine.

11.     Fairchild does not publicize its corporate structure and, though comprised of many subsidiaries, holds itself out as a single entity.

12.     The operations of Fairchild's wholly owned subsidiaries are subject to the control and direction of Fairchild from the United States, including subsidiaries, if any, responsible for the design, manufacture, and sale of the Voltage Regulators.

13.     Upon information and belief, corporate formalities between any such Fairchild subsidiaries and Fairchild are not observed.

14.     For instance, in attempting to resolve this dispute, AcBel met several times with executives of Fairchild based in the United States.  No settlement discussions occurred between AcBel and any subsidiary of Fairchild based elsewhere.

15.     Both AcBel and Fairchild design and manufacture hardware components for various electronic products.

16.     Fairchild is registered to do business in Massachusetts and, upon information and belief, derives substantial revenue from its sales in the state.

17.     Fairchild marketed the Voltage Regulators around the world, including in Massachusetts.

18.     Fairchild has a sales office in Massachusetts.  Several authorized Fairchild distributors are also located in Massachusetts:  Arrow Electronics, Avnet Electronics, and Future Electronics.  Fairchild lists these three Massachusetts distributors on its website (http://www.fairchildsemi.com/about-fairchild/cf/sc_USA/).

19.     Fairchild was also in frequent communication, both over the phone and by email, with AcBel and EMC personnel in Massachusetts in connection with the Voltage Regulators.

20.     Both AcBel and EMC were harmed in Massachusetts as a consequence of the failure of the Voltage Regulators.

21.     Fairchild is subject to both general jurisdiction in Massachusetts and specific jurisdiction under the Massachusetts long-arm statute:  Mass. Gen. Laws ch. 223A, § 3.

22.     The amount in controversy exceeds $75,000.

23.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §1332(a) because the parties are diverse.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) because Fairchild is subject to personal jurisdiction in Massachusetts.

AcBel's Power Supply Unit

25.     AcBel designed and manufactured a power supply unit (defined above as "PSU") for its long-time customer, EMC.

26.     EMC's principal place of business is in Massachusetts.

27.     The request for AcBel to design the PSU was made by EMC in Massachusetts.

28.     Qualification of the PSU for use in EMC products occurred in Massachusetts.

29.     AcBel and EMC met and continue to meet frequently in Massachusetts to discuss issues concerning the PSUs, including pricing.

30.     For the relevant period—2010—the unit bore the AcBel part number 071-000-438 or 071-000-532.  The PSU is approximately 12" W x 5" L x 1.5" H.

31.     A PSU is a device that supplies a steady stream of electric power by regulating the voltage input and, in some PSUs, by providing an uninterruptible power supply source in the event of a power failure.

32.     The PSU contained a microcircuit component manufactured by Fairchild (defined above as the "Voltage Regulators").  During the relevant period, the Voltage Regulators bore the

Fairchild part number KA7805ERTM.  The Voltage Regulators are tiny, approximately 5 mm x 5 mm x 2mm.

33.     Voltage regulators are devices that maintain a consistent output of volts, or electric power.  Electronic devices typically require that voltage levels not exceed a certain volt threshold and are often badly damaged by power surges.  Those devices may also not be able to function if the current does not exceed a minimum voltage threshold.  A voltage regulator generates a fixed output current within a preset range despite any surge or weakness in the voltage input.  The Voltage Regulators were critical components of the PSUs AcBel designed for EMC.

34.     AcBel typically purchased Fairchild's Voltage Regulators via Fairchild's agent and distributor, Synnex Electronics Hong Kong Ltd.  But the price-point for the Voltage Regulators were agreed upon by AcBel and Fairchild directly.

35.     On various documents, Fairchild lists its customer as Synnex/AcBel.

36.     Upon information and belief, Fairchild was aware that AcBel purchased and installed its Voltage Regulators in PSUs designed and manufactured for EMC, based in Massachusetts.

37.      The PSUs were incorporated into large EMC data storage devices known as Disk Array Enclosures or DAEs.  Though the DAEs range in size, depending on the model, they are approximately the size of a large filing cabinet.

### The Voltage Regulators' New Design

38.      Sometime in 2008 or 2009, Fairchild redesigned its Voltage Regulators.  To save space and money, Fairchild shrunk the die (the conducting component of the Voltage Regulators' computer chip) and moved it to the edge.  The size of the chip itself remained the same.

39.     Starting in the first week of January 2010, Fairchild began shipping the redesigned Voltage Regulators to its customers, including AcBel.

40.     Fairchild did not follow the industry practice of notifying AcBel that, as of the first week of 2010, the chip had a new design, as is customary in the industry when a product undergoes a material change such as a shrunk and shifted die.

41.     Fairchild did not change the part number for the Voltage Regulators, as is customary in the industry when a product undergoes a material change such as a shrunk and shifted die.

42.     Fairchild's failure to notify its customers of the change violated industry custom.

43.     In total, AcBel purchased approximately 195,000 Voltage Regulators with the new design.

<u>The Voltage Regulator Defect</u>

44.     In June 2010, one of Fairchild's customers—a Japanese solar panel company— began to experience an extremely high rate of failure in connection with the newly designed Voltage Regulators.

45.     Fairchild ran a battery of tests in the summer of 2010 on its Voltage Regulators and determined that such failures were caused by a design defect.  According to Fairchild, the shrunk die, which was placed on the side rather than the center of the chip, was extremely vulnerable to the accumulation of humidity and water on the chip.  The accumulation of water would then cause the chip to short circuit and the Voltage Regulators to fail.

46.     Fairchild concluded that the new chip design was defective and, in week 35 of 2010 (late August or early September), reverted back to the former design of the Voltage

Regulators, which placed the die in the center of the chip.  The accumulation of humidity and water was not a problem with the old design.

<u>Fairchild Conceals the Design Defect From AcBel</u>

47.     As of week 35 of 2010, Fairchild stopped manufacturing the defective Voltage Regulators.  As Fairchild later admitted to AcBel, the defectively-designed Voltage Regulators bear the date codes EA 01 through EA 34. (The date codes are physically printed on the chips.)

48.     Fairchild did not disclose the fact that it had changed the design of the Voltage Regulators by reverting back to the old design in week 35, as is required by the custom in the industry when a product undergoes a material design change.

49.     Nor did Fairchild change the part number for its Voltage Regulators when it changed the design, as is required by the custom in the industry when a product undergoes as material design change.

50.     Fairchild's failure to notify AcBel that the design of the Voltage Regulators had changed is in contravention of industry custom.

51.     Even more problematic was Fairchild's failure to disclose to AcBel that the reason for the change was Fairchild's discovery that the Voltage Regulators manufactured in the first 34 weeks of 2010 were defective.

52.     Upon information and belief, Fairchild failed to disclose the change because it was attempting to conceal the defect from AcBel.

53.     Upon information and belief, each of the decisions identified in paragraphs 49-54 were made by Fairchild executives based in the United States.

54.     AcBel purchased approximately 195,000 defective Voltage Regulators.

55.     At the time Fairchild discovered the defect in its Voltage Regulators, many of the PSUs containing the defective Voltage Regulators had yet to be deployed in the field, they were either in AcBel's production line or EMC's production line.  By the time AcBel and EMC discovered the defect, many of the PSUs were deployed in the field, primarily in the United States.

56.     By failing to timely disclose the defect, Fairchild guaranteed that the remediation of the defect would be costly as servicing a PSU in the field is exponentially more expensive than servicing a PSU in inventory.

57.     Pulling units off the production line to swap out the defective Voltage Regulators would have involved minimal labor and almost no shipping costs.

58.     Servicing units already in the field with end users is a labor-intensive endeavor, involving travel and physical removal of the affected PSU.

59.     In addition, the PSU must then be shipped by the technician, typically by air freight, to AcBel's facilities in either Hopkinton, Massachusetts or Cork, Ireland (PSUs in the United States were shipped to Hopkinton while PSUs in Europe were shipped to Cork) for the repair to be completed.

Epidemic Failure

60.     In early December of 2010 the PSUs began to fail at an epidemic rate in the field.

61.     On or about December 6, 2010, working together in Massachusetts, EMC and AcBel identified the Voltage Regulators as the likely culprit.

62.     EMC and AcBel notified Fairchild of the high failure rates.

63.     EMC and AcBel also informed Fairchild that they had investigated the high rate of failure and concluded that Fairchild's Voltage Regulators were the cause.

64.     On or about December 8, 2010, Fairchild employee John Lin admitted in an email to AcBel employee Gary Ma, among others, that Fairchild had "almost . . . confirmed" that the Voltage Regulator failure experienced by EMC/AcBel was the "same failure" experienced by a prior customer.

65.     On or about December 9, 2010, in an email from John Lin to AcBel employee Gary Ma, among others, Fairchild admitted that it reverted back to the original Voltage Regulator design because of a design defect that caused field failures with another customer.  In response to Mr. Ma's question whether "the change in week 35 back to the original design [was] due to the humidity susceptibility/Zener shift problems that were occurring on the die shrink part," Mr. Lin affirmed "Yes."

66.     AcBel personnel based in Massachusetts were included in these emails.

67.     Upon information and belief, the defect in the Voltage Regulators caused failures for multiple Fairchild customers.

68.     On or about December 9, 2010, Fairchild finally provided AcBel an "8D Corrective Action Report," dated November 16, 2010.  The report chronicles the Voltage Regulators' failure in connection with the other customer and concludes that the redesign was the cause of the failures.  The new design was highly susceptible to failure under certain conditions, and the report recommends that Fairchild revert back to the old design, which it had already done as of the date of the report.  Upon information and belief, Fairchild issued a draft report to its customer much earlier, sometime in the summer of 2010.

69.     Upon information and belief, the draft report, like the final report, concluded that the problem was caused by the design of the Voltage Regulators and the draft report also

recommended that Fairchild discontinue the new design and revert back to the old one.  This change occurred in week 35 of 2010.

70.     On or about December 22, 2010, Fairchild Senior Director Eric Hertz sent a letter to AcBel in which he confirmed that Fairchild discontinued the defective design after week 34 of 2010.  As the letter from Mr. Hertz explains—"Affected date code of shrunk die:  1001 ~ 1034." That letter was attached to an email sent to numerous recipients, including several based in Massachusetts.

71.     The date code is physically printed on the Voltage Regulator.

72.     On or about December 28, 2010, Fairchild admitted in a PowerPoint presentation sent to AcBel, including AcBel personnel based in Massachusetts, that (A) "the switch back of non-shrink die" occurred in week 35 of 2010 after investigating the other customer's complaint for "1 ~ 2 months" and that (B) switching back to the prior design was the best "way to contain[] the failure."

73.     Following Fairchild's admission that its Voltage Regulators sold in the first 34 weeks of 2010 were defective, AcBel was able to identify which PSUs were at risk.  AcBel tracks the microcircuit component parts in every PSU it manufactures.  The traceability is not perfect, nor is perfect traceability customary for small microcircuit component parts such as Voltage Regulators.  Accordingly, AcBel was able to narrow down the number of PSUs potentially containing one of the defective Voltage Regulators to 270,000.  AcBel had purchased 195,000 defective Voltage Regulators.

74.     AcBel provided EMC a list identifying those 270,000 at risk PSUs by individual serial number (the "Purge List").

## The Rework

75.    EMC identified customers with PSUs on the purge list that had a heightened risk of failure, notified them of the issue, and undertook replacement procedures.

76.    The work was costly and labor intensive.  For each PSU, EMC service personnel had to travel to the customer, physically remove the PSU from the DAE, and replace it with a working PSU.

77.    EMC would also air freight the affected PSU to AcBel (typically in Hopkinton, Massachusetts or Cork, Ireland) to be fixed.

78.    AcBel personnel at its facilities in Hopkinton and Cork would then rework each PSU returned by EMC—typically by air freight—swapping out the defective Voltage Regulators with good ones.  It would typically take AcBel personnel about 15 minutes to rework each PSU.

79.    Fairchild shipped Voltage Regulators directly to AcBel in Massachusetts to assist in the troubleshooting and remediation effort.

## The Assignment

80.    EMC and AcBel entered into an agreement whereby EMC and AcBel resolved their dispute in connection with the PSU failures caused by the defect in the Voltage Regulators.

81.    As part of that agreement, EMC assigned its claims against Fairchild to AcBel.

82.    Specifically, the agreement provides:  "EMC hereby assigns to AcBel all rights, title, and interest to all claims, current and future, known or unknown, that EMC now has or may have against Fairchild relating to the [Voltage Regulator] Defect."

83.    Accordingly, AcBel asserts claims in both its own name and as an assignee of EMC against Fairchild.

**AcBel's Causes of Action against Fairchild**

<u>First Cause of Action (Breach of Implied Warranty)</u>

84.     AcBel repeats and realleges paragraphs 1 through 83 as if fully set forth herein.

85.     Fairchild sold AcBel approximately 195,000 Voltage Regulators in 2010.

86.     Fairchild reasonably expected that AcBel would use, consume, or be affected by the Voltage Regulators.

87.     Fairchild impliedly warranted that the Voltage Regulators sold to AcBel were fit for their ordinary purpose.

88.     Fairchild breached the implied warranty of merchantability by selling AcBel approximately 195,000 defective Voltage Regulators in 2010 which were unfit for their ordinary purpose.

89.     AcBel provided Fairchild timely notice of its breach of the implied warranty of merchantability.

90.     AcBel is unaware of any express warranty terms governing its purchase of the Voltage Regulators.

91.     The Voltage Regulator defect caused AcBel damages in amounts to be determined at trial, in an amount not less than $30 million.

Second Cause of Action
<u>(Breach of Implied Warranty of Fitness For Particular Purpose)</u>

92.     AcBel repeats and realleges paragraphs 1 through 91 as if fully set forth therein.

93.     Fairchild sold AcBel approximately 195,000 Voltage Regulators in 2010.

94.     Fairchild reasonably expected that AcBel would use, consume, or be affected by the Voltage Regulators.

95.     Upon information and belief, Fairchild knew that AcBel would install its Voltage Regulators into PSUs AcBel designed, manufactured, and sold to EMC for EMC's DAEs.

96.     AcBel relied upon Fairchild's skill and expertise to furnish Voltage Regulators suitable for this particular purpose.

97.     Upon information and belief, Fairchild also knew that AcBel was relying on its skill and expertise to manufacture Voltage Regulators fit for its particular purpose.

98.     Fairchild impliedly warranted that the Voltage Regulators were fit for the particular purpose of supplying steady and constant voltage in products manufactured by AcBel for EMC.

99.     Fairchild breached the implied warranty of fitness by selling approximately 195,000 Voltage Regulators which were defectively designed and unfit for AcBel's purposes.

100.    AcBel provided Fairchild timely notice of its breach of the implied warranty of fitness.

101.    The Voltage Regulator defect caused AcBel damages in amounts to be determined at trial, in an amount not less than $30 million.

### Third Cause of Action (Fraud)

102.    AcBel repeats and realleges paragraphs 1 through 101 as if fully set forth herein.

103.    Fairchild falsely represented that the Voltage Regulators did not undergo a material design change by failing to change the part number for the Voltage Regulators in week 1 of 2010.

104.    Fairchild falsely represented that the Voltage Regulators did not undergo a second material design change by failing to change the part number for the Voltage Regulators in week 35 of 2010.

105.    Fairchild reverted back to the old design of the Voltage Regulators in week 35 of 2010 without disclosing the change to AcBel.

106.    Upon information and belief, Fairchild reverted back to the old design of the Voltage Regulators without disclosing the change to AcBel in an effort to conceal the fact that the new design was defective.  In changing back to the old design, Fairchild hoped that AcBel would not discover the defect in the discontinued new design.

107.    Fairchild's misrepresentations that the Voltage Regulators did not twice undergo a material design change were of a material fact.

108.    Fairchild's misrepresentations were made with knowledge of their falsity or, at a minimum, in reckless disregard of whether they were true or false.

109.    Fairchild's misrepresentations were made for the purpose of inducing AcBel to act in reliance upon them.

110.    AcBel justifiably relied upon Fairchild's misrepresentations to its detriment by incorporating Voltage Regulators containing the defect into its PSUs.

111.    Fairchild's misrepresentations damaged AcBel in amounts to be determined at trial, in an amount not less than $30 million.

Fourth Cause of Action (Fraudulent Omission)

112.    AcBel repeats and realleges paragraphs 1 through 111 as if fully set forth herein.

113.    Fairchild had a duty to disclose that it made material changes to its Voltage Regulators in weeks 1 and 35 of 2010.

114.    And Fairchild had a duty to disclose that the reason for that material design change in week 35 was that the Voltage Regulators had a high susceptibility to failure.

115.    By failing to disclose that material design change, Fairchild knowingly or, at a minimum, recklessly concealed the latent defect from AcBel.

116.    Fairchild also knowingly or, at a minimum, recklessly concealed the design changes from AcBel by failing to change the part number for its redesigned Voltage Regulators in either week 1 or week 35 of 2010.

117.    Fairchild knowingly or, at a minimum, recklessly concealed the known design defect from AcBel by failing to change the part number for its Voltage Regulators when it reverted back to the original design in week 35 of 2010.

118.    Fairchild knowingly or, at a minimum, recklessly concealed the known design defect from AcBel by reverting back to the old design in week 35 of 2010.

119.    Fairchild knowingly or, at a minimum, recklessly concealed the design defect from AcBel by failing to give AcBel a copy of either a draft or final version of the 8D Corrective Action Report provided to Fairchild's Japanese solar company customer until December 2010— after the Voltage Regulators placed by AcBel in the PSUs designed for EMC began experiencing epidemic rates of failure.  The final version of the report bears the date November 16, 2010, but, upon information and belief, draft versions of the report were distributed by Fairchild to certain customers in the summer or early fall of 2010.

120.    The Voltage Regulator design changes and the Voltage Regulator design defect are material facts.

121.    Fairchild's omissions and affirmative concealment of material facts were made for the purpose of inducing AcBel act in reliance upon them.

122.     AcBel justifiably relied on Fairchild's omissions and affirmative concealment of material facts to its detriment by continuing to incorporate the defective voltage regulators into its PSUs.

123.     Fairchild's omissions and affirmative concealment of material facts caused damage to AcBel in amounts to be determined at trial, in an amount not less than $30 million.

<u>Fifth Cause of Action (Negligent Misrepresentation)</u>

124.     AcBel repeats and realleges paragraphs 1 through 123 as if fully set forth herein.

125.     Fairchild misrepresented the version of Voltage Regulators it sold to AcBel starting in week 1 of 2010 by failing to change the part number following the design change.

126.     The design change in week 1 of 2010 was a material fact.

127.     After concluding the new design was defective and reverting to the previous design of the Voltage Regulators in week 35 of 2010, Fairchild misrepresented the version of Voltage Regulators it sold to AcBel by failing to change the part number once again.

128.     The design change in week 35 was a material fact.

129.     The defect in the Voltage Regulators was a material fact.

130.     Fairchild misrepresented the version of the Voltage Regulators without reasonable grounds for believing them to be true.

131.     Fairchild also had a duty to disclose that there was a material change in the design of the Voltage Regulators in weeks 1 and 35 of 2010.

132.     And Fairchild had a duty to disclose that the reason for that material design change in week 35 was the Voltage Regulators' high susceptibility to failure.

133.     By failing to disclose that material design change or the known defect in the Voltage Regulator, Fairchild breached that duty.

134.    Fairchild intended AcBel to rely on its misrepresentations and omissions.

135.    AcBel was ignorant of the truth and justifiably relied on Fairchild's misrepresentations and omissions by continuing to incorporate the defective Voltage Regulator into its PSUs.

136.    AcBel suffered damages as a result of its reliance on Fairchild's misrepresentations and omissions in amounts to be determined at trial, in an amount not less than $30 million.

Sixth Cause of Action (Design Defect— Implied Warranty/Strict Liability)

137.    AcBel repeats and realleges paragraphs 1 through 136 as if fully set forth herein

138.    Fairchild manufactured Voltage Regulators between weeks 1 and 34 of 2010 that suffered from a design defect.

139.    AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010.

140.    The design defect existed at the time the Voltage Regulators left Fairchild's possession.

141.    The design defect caused injury to AcBel.

142.    AcBel's injury resulted from its use of the Voltage Regulators in a manner reasonably foreseeable by Fairchild.

143.    AcBel has been damaged in amounts to be determined at trial, in an amount not less than $30 million.

Seventh Cause of Action Action (Design Defect—Negligence)

144.    AcBel repeats and realleges paragraphs 1 through 143 as if fully set forth herein.

145.    Fairchild manufactured Voltage Regulators between weeks 1 and 34 of 2010 that suffered from a design defect.

18

146.     AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010.

147.     Fairchild owed AcBel, a reasonably foreseeable user of its product, a duty of care in the design and adoption of its product.

148.     Fairchild breached that duty of care by manufacturing Voltage Regulators with a design defect between weeks 1 and 34 of 2010.

149.     The design defect existed at the time the Voltage Regulators left Fairchild's possession.

150.     The design defect caused injury to AcBel.

151.     AcBel's injury resulted from a use of the Voltage Regulators in a manner reasonably foreseeable by Fairchild.

152.     AcBel has been damaged in amounts to be determined at trial, in an amount not less than $30 million.

Eighth Cause of Action (Failure to Warn—Implied Warranty/Strict Liability)

153.     AcBel repeats and realleges paragraphs 1 through 152 as if fully set forth herein.

154.     Fairchild manufactured the Voltage Regulators between weeks 1 and 34 of 2010 that suffered from a design defect.

155.     AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010.

156.     The defect existed at the time the Voltage Regulators left Fairchild's possession.

157.     As of week 35 of 2010, Fairchild was aware that the Voltage Regulator was defective.

158.    As of week 35 of 2010, Fairchild was also aware that the heightened rate of failure was caused by the accumulation of water and humidity.  Fairchild was further aware that certain applications and environments might enhance the already epidemic risk of failure.

159.    Fairchild had a duty to disclose or warn AcBel of known and substantial risks associated with the defect in the Voltage Regulators.

160.    Fairchild failed to disclose or warn AcBel about the cause of the failure or the heightened rate of failure in certain environments.

161.    Fairchild's failure to disclose or warn AcBel about the cause of the failure or the heightened rate of failure caused injury to AcBel.

162.    AcBel has been damaged in amounts to be determined at trial, in an amount not less than $30 million.

<u>Ninth Cause of Action (Failure to Warn—Negligence)</u>

163.    AcBel repeats and realleges paragraphs 1 through 162 as if fully set forth herein.

164.    The Voltage Regulators manufactured by Fairchild between weeks 1 and 34 of 2010 were defective.

165.    AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010.

166.    The defect existed at the time the Voltage Regulators left Fairchild's possession.

167.    As of week 35 of 2010, Fairchild was aware that the Voltage Regulators was defective.

168.    As of week 35 of 2010, Fairchild was also aware that the heightened rate of failure was caused by the accumulation of water and humidity.  Fairchild was further aware that certain applications and environments might enhance the already epidemic risk of failure.

169.    Fairchild owed AcBel, a known purchaser and user of its product, a duty to warn of known and substantial risks associated with the defect in the Voltage Regulators.

170.    Fairchild breached that duty of care by failing to disclose or warn AcBel about the cause of the failure or the heightened rate of failure in certain environments.

171.    Fairchild's failure to disclose or warn AcBel about the cause of the failure or the heightened rate of failure caused injury to AcBel.

172.    AcBel's injury resulted from a use of the Voltage Regulators that was reasonably foreseeable by Fairchild.

173.    AcBel has been damaged in amounts to be determined at trial, in an amount not less than $30 million.

Tenth Cause of Action (Violation of M.G.L. c. 93A § 11)

174.    AcBel repeats and realleges paragraphs 1 through 173 as if fully set forth herein.

175.    AcBel purchased the Voltage Regulators from Fairchild in 2010 in the course of its trade or commerce.

176.    Upon information and belief, Fairchild knew that its Voltage Regulators would be incorporated into PSUs that were, in turn, to be incorporated into EMC DAEs.  The PSU purchase orders originated from or were directed by EMC in Massachusetts.

177.    Fairchild engaged in trade or commerce by selling the Voltage Regulators to AcBel in 2010.

178.    Fairchild employed an unfair method or deceptive act or practice by concealing and failing to disclose a known defect in the design of the Voltage Regulators.

179.    Fairchild employed an unfair method or deceptive act or practice by continuing to manufacture and sell the Voltage Regulators to AcBel using the same part number despite two material design changes that occurred in weeks 1 and 35 of 2010.

180.    Fairchild employed an unfair method or deceptive act or practice in the course of its trade or commerce by selling to AcBel the defective Voltage Regulators in breach of its implied and express warranties.

181.    Repairs were made to PSUs containing the defective Voltage Regulator by AcBel in Massachusetts.

182.    Fairchild's unfair method or deceptive acts or practices had a substantial effect on commerce in the Commonwealth of Massachusetts.

183.    Fairchild's unfair method or deceptive acts or practice occurred primarily and substantially in the Commonwealth of Massachusetts.

184.    Fairchild's unfair method or deceptive acts or practice caused AcBel to incur damages in amounts to be determined at trial, in an amount not less than $30 million.

185.    AcBel is entitled to attorney's fees, costs, and treble damages because Fairchild's unfair method or deceptive acts or practice were made in willful or knowing violation of M.G.L. c. 93A.

Eleventh Cause of Action (Punitive Damages)

186.    AcBel repeats and realleges paragraphs 1 through 185 as if fully set forth herein.

187.    Fairchild's active concealment of the failures of the Voltage Regulators and the heightened rate of failure in certain environments was motivated by actual malice, or was so outrageous that malice is implied.

188.    Fairchild's active concealment of the known latent defect in the Voltage Regulators was motivated by actual malice, or was so outrageous that malice is implied.

189.    Fairchild's active concealment caused damage to AcBel in amounts to be determined at trial, in an amount not less than $30 million.

190.    AcBel is entitled to punitive damages as a result of Fairchild's malicious and outrageous conduct.

### AcBel's Causes of Action Against Fairchild As EMC Assignee

### Twelfth Cause of Action (Implied Warranty)

191.    AcBel repeats and realleges paragraphs 1 through 190 as if fully set forth herein.

192.    Fairchild sold AcBel several hundred thousand Voltage Regulators in 2010, which AcBel placed in PSUs manufactured and sold to EMC that same year.

193.    Upon information and belief, Fairchild reasonably expected that EMC would use, consume, or be affected by the Voltage Regulators.

194.    Fairchild breached the implied warranty of merchantability by selling the defective Voltage Regulators to AcBel that were unfit for their ordinary purpose, which AcBel installed in PSUs sold to EMC.

195.    Orders for the PSUs originated from or were directed by EMC in Massachusetts.

196.    EMC provided Fairchild timely notice of its breach of the implied warranty of merchantability.  Notice was provided by EMC from Massachusetts.

197.    The defect in the Voltage Regulators caused EMC damages in an amount to be determined at trial.

### Thirteenth Cause of Action (Implied Warranty of Fitness For Particular Purpose)

198.    AcBel repeats and realleges paragraphs 1 through 197 as if fully set forth therein.

23

199.    Fairchild sold AcBel several hundred thousand Voltage Regulators in 2010, which AcBel placed in PSUs manufactured and sold to EMC in that same year.

200.    Upon information and belief, Fairchild knew that AcBel would install its Voltage Regulators in PSUs designed, manufactured, and sold to EMC for EMC's DAEs.

201.    Orders for the PSUs originated from or were directed by EMC in Massachusetts.

202.    EMC relied upon Fairchild's skill and expertise to furnish the Voltage Regulators suitable for its particular purpose.

203.    Upon information and belief, Fairchild also knew that EMC was relying on its skill and expertise to manufacture the Voltage Regulators fit for its purpose.

204.    Fairchild impliedly warranted that the Voltage Regulators were fit for the particular purpose of supplying constant voltage in products manufactured and sold to EMC.

205.    Fairchild breached the implied warranty of fitness by supplying approximately 195,000 defectively designed Voltage Regulators which were unfit for EMC's purposes.

206.    EMC provided Fairchild timely notice of its breach of the implied warranty of fitness.

207.    The Voltage Regulator defect caused EMC damages in an amount to be determined at trial.

Fourteenth Cause of Action (Design Defect—Implied Warranty/Strict Liability)

208.    AcBel repeats and realleges paragraphs 1 through 207 as if fully set forth herein

209.    Fairchild manufactured defective Voltage Regulators between weeks 1 and 34 of 2010.

210.    EMC purchased several hundred thousand PSUs from AcBel in 2010 which contained the Voltage Regulator manufactured by Fairchild between weeks 1 and 34 of 2010. Those Voltage Regulators suffered from a design defect.

211.    The design defect existed at the time the Voltage Regulators left Fairchild's possession.

212.    The design defect caused injury to EMC in Massachusetts.

213.    EMC's injury resulted from its use of the Voltage Regulators in a manner reasonably foreseeable by Fairchild.

Fifteenth Cause of Action Action (Design Defect—Negligence)

214.    AcBel repeats and realleges paragraphs 1 through 213 as if fully set forth herein.

215.    Fairchild manufactured and sold the defectively designed Voltage Regulators to AcBel in 2010, which AcBel installed in products designed, manufactured, and sold to EMC.

216.    Fairchild owed EMC, a reasonably foreseeable user of its product, a duty of care in the design and adoption of its product.

217.    Fairchild breached that duty of care by manufacturing the Voltage Regulators with a design defect between weeks 1 and 34 of 2010.

218.    The design defect existed at the time the Voltage Regulators left Fairchild's possession.

219.    The design defect caused injury to EMC in Massachusetts.

220.    EMC's injury resulted from a use of the Voltage Regulators in a manner reasonably foreseeable by Fairchild.

Sixteenth Cause of Action (Failure to Warn—Implied Warranty/Strict Liability)

221.    AcBel repeats and realleges paragraphs 1 through 220 as if fully set forth herein.

222.    Fairchild manufactured defectively designed the Voltage Regulators between weeks 1 and 34 of 2010.

223.    AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010, which AcBel then installed in PSUs designed, manufactured, and sold to EMC.

224.    EMC was a reasonably foreseeable user of Fairchild's Voltage Regulators.

225.     The Voltage Regulator defect existed at the time the Voltage Regulators left Fairchild's possession.

226.    As of Week 35 of 2010, Fairchild was aware that the Voltage Regulator was defective.

227.    As of Week 35 of 2010, Fairchild was also aware that the heightened rate of failure was caused by the accumulation of water and humidity.  Fairchild was further aware that certain applications and environments might enhance the already epidemic risk of failure.

228.    Fairchild had a duty to disclose or warn EMC about known and substantial risks associated with the Voltage Regulator defect.

229.    Fairchild failed to disclose or warn EMC about the cause of the failure or the heightened rate of failure in certain environments.

230.    Fairchild's failure to disclose or warn EMC about the cause of the failure or the heightened rate of failure caused injury to EMC in Massachusetts.

<u>Seventeenth Cause of Action (Failure to Warn—Negligence)</u>

231.    AcBel repeats and realleges paragraphs 1 through 230 as if fully set forth herein.

232.    Fairchild manufactured the defectively designed Voltage Regulators between weeks 1 and 34 of 2010.

233.    AcBel purchased approximately 195,000 defective Voltage Regulators from Fairchild in 2010, which AcBel then installed in PSUs designed, manufactured, and sold to EMC.

234.    EMC was a reasonably foreseeable user of Fairchild's Voltage Regulators.

235.    The defect existed at the time the Voltage Regulators left Fairchild's possession.

236.    As of Week 35 of 2010, Fairchild was aware that the Voltage Regulator was defective.

237.    As of Week 35 of 2010, Fairchild was also aware that the heightened rate of failure was caused by the accumulation of water and humidity.  Fairchild was further aware that certain applications and environments might enhance the already epidemic risk of failure.

238.    Fairchild owed EMC a duty to warn of known and substantial risks associated with the defect in the Voltage Regulators..

239.    Fairchild breached that duty of care by failing to disclose or warn EMC about the cause of the failure or the heightened rate of failure in certain environments.

240.    Fairchild's failure to disclose or warn EMC about the cause of the failure or the heightened rate of failure caused injury to EMC in Massachusetts.

241.    EMC's injury resulted from a use of the Voltage Regulators that was reasonably foreseeable by Fairchild.

Eighteenth Cause of Action (Violation of M.G.L. c. 93A § 11)

242.    AcBel repeats and realleges paragraphs 1 through 241 as if fully set forth herein.

243.    EMC's principal place of business is in Massachusetts.

244.    AcBel purchased the Voltage Regulators from Fairchild in 2010 in the course of its trade or commerce.

245.    EMC purchased PSUs from AcBel containing Fairchild's Voltage Regulators in 2010 in the course of its trade or commerce.

246.    EMC's PSU purchase orders were made or directed by EMC from Massachusetts.

247.    Fairchild engaged in trade or commerce by selling the Voltage Regulators to AcBel in 2010.

248.    Upon information and belief, Fairchild was aware that its Voltage Regulators would be incorporated into PSUs ordered by EMC from Massachusetts.

249.    Fairchild employed an unfair method or deceptive act or practice by concealing and failing to disclose a known defect in the design of the Voltage Regulators.

250.    Fairchild employed an unfair method or deceptive act or practice by continuing to manufacture and sell the Voltage Regulators to AcBel using the same part number despite two material design changes that occurred in weeks 1 and 35 of 2010.

251.    Fairchild employed an unfair method or deceptive act or practice in the course of its trade or commerce by selling the defective Voltage Regulators to AcBel in breach of its implied and express warranties.

252.    Repairs were made to PSUs containing the defective Voltage Regulator by AcBel in Massachusetts.

253.    Fairchild's unfair method or deceptive acts or practice occurred or had a substantial affect upon commerce within the Commonwealth of Massachusetts.

254.    Fairchild's unfair method or deceptive acts or practice occurred primarily and substantially in the Commonwealth Massachusetts.

255.    Fairchild's unfair method or deceptive acts or practice caused EMC to incur damages in Massachusetts in an amount to be determined at trial.

256.    EMC is entitled to attorney's fees, costs, and up to treble damages because Fairchild's unfair method or deceptive acts or practice were made in willful or knowing violation of M.G.L. c. 93A.

### Nineteenth Cause of Action (Punitive Damages)

257.    AcBel repeats and realleges paragraphs 1 through 256 as if fully set forth herein.

258.    Fairchild's active concealment of the failures of the Voltage Regulators or the heightened rate of failure in certain environments was motivated by actual malice, or was so outrageous that malice is implied.

259.    Fairchild's active concealment of the known latent defect in the Voltage Regulators was motivated by actual malice, or was so outrageous that malice is implied.

260.    Fairchild's active concealment caused damage to EMC in amounts to be determined at trial.

261.    EMC is entitled to punitive damages as a result of Fairchild's malicious and outrageous conduct.

### **PRAYER FOR RELIEF**

WHEREFORE, AcBel demands judgment against Fairchild as follows:

A.    Damages, in an amount to be determined at trial, in an amount not less than $30,000,000 with interest.

B.    Punitive damages and treble damages, in an amount to be determined at trial.

C.    The costs, attorney's fees and treble damages incurred by AcBel by reason of Fairchild's knowing and willful violation of M.G.L. c. 93A § 11.

D.      Costs, disbursements, and attorney's fees in this proceeding, to the extent not granted by reason of Prayer B above, and such other and further equitable or monetary relief as this Court may deem just and proper.

Dated: January 6, 2014

        Boston, Massachusetts


                        ACBEL POLYTECH INC.


                By:     */s/ Kurt S. Kusiak*_____
                        Kurt S. Kusiak (BBO #559254)
                        Ryan M. Cunningham (BBO #661440)
                        SALLY & FITCH LLP
                        One Beacon Street, 16th Floor
                        Boston, MA 02108
                        (617) 542-5542
                        ksk@sally-fitch.com
                        rmc@sally-fitch.com


                        Richard N. Chassin
                        Jesse T. Conan
                        Michelle R. Mufich
                        BECKER, GLYNN, MUFFLY,
                        CHASSIN & HOSINSKI LLP
                        299 Park Avenue
                        New York, New York 10171
                        Tel: (212) 888-3033

                        *Attorneys for AcBel Polytech Inc.*