UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ACBEL POLYTECH INC., individually and as an assignee of certain claims,<br><br>               Plaintiff,<br><br>     v.<br><br>FAIRCHILD SEMICONDUCTOR INTERNATIONAL, INC., and FAIRCHILD SEMICONDUCTOR CORPORATION,<br><br>             Defendants. | Civil Action No.: 13-13046-DJC |

**MEMORANDUM IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor

Corporation (collectively, the "Defendants") respectfully submit this Memorandum of Law in

support of their Motion for Summary Judgment on all counts of the Amended Complaint ("AC")

filed by Plaintiff AcBel Polytech Inc. ("AcBel").

## INTRODUCTION[1]

AcBel seeks to recover for alleged injuries following a redesign of microcircuit

component parts (the "Voltage Regulators"), but has not named the Voltage Regulators'

designer, manufacturer, or distributor as a defendant.  AcBel tries to avoid this problem by

claiming Defendants are liable for the conduct of independent entities in a lengthy commercial

supply chain <u>that did not include either Defendant</u>.  The chain starts with Synnex Technology

International Corp. ("Synnex"), an independent company unaffiliated with Defendants, and

moves through several fully capitalized, completely separate, and independently operating

Foreign Subsidiaries.  Defendants are not legally responsible for these entities.

To maintain its case, AcBel must find a way to circumvent the absence of any contractual

relationship, any relevant direct dealings, any relevant communications, and – in the case of

AcBel's customer EMC Corporation ("EMC") – any relevant relationship whatsoever.  At the

pleading stage, AcBel did so by reimagining the distribution chain, Defendants' relationship with

Synnex, and AcBel's own, extremely attenuated relationship with Defendants.  We are now well

---

[1] For ease of reference, this Memorandum uses the term "Foreign Subsidiaries" to mean Fairchild Semiconductor Technology (Shanghai) Co., Ltd. ("Fairchild Shanghai"), Fairchild Semiconductor (Suzhou) Co. Ltd., Fairchild Semiconductor Technology (Beijing) Co., Ltd., Fairchild Korea Semiconductor Ltd. ("Fairchild Korea"), Fairchild Semiconductor Pte. Ltd. ("Fairchild Singapore"), and Fairchild Semiconductor Hong Kong Ltd. ("Fairchild HK"), collectively.

past that stage.  There is no need for a bench trial[2] because the undisputed facts disprove every

material allegation supporting AcBel's liability theories[3]:

- The Contractual Warranty Claims fail for lack of privity.  Defendants only dealt directly with AcBel long after AcBel purchased the Voltage Regulators from Synnex; such <u>ex post</u> dealings are irrelevant to the privity analysis.

- There is no evidence to rebut the strong presumption of corporate separateness. Defendants did not exercise day-to-day control over the activities of the Foreign Subsidiaries or Synnex, nor did they dominate them with respect to the Voltage Regulators purchased by AcBel.  Further, there no basis for piercing the corporate veil because the Foreign Subsidiaries were and are adequately capitalized and able to satisfy their own liabilities.

- The Misrepresentation Claims fail because Defendants – who were uninvolved in the sale at issue here – neither made representations to AcBel or EMC nor had a duty to provide any information AcBel claims they withheld.  Moreover, AcBel knew about the Voltage Regulator redesign because Synnex advised AcBel in writing of the precise design change of which AcBel claims it was unaware.

- The economic loss doctrine bars the Design Defect Claims and Failure to Warn Claims, as well as the c. 93A Claims to the extent they are based on negligence.  No exception to the economic loss rule applies because the Voltage Regulators did not cause any damage to any person or property.

- The Design Defect Claims and Failure to Warn Claims also fail because: (i) Defendants owed no duty to AcBel or EMC because Defendants did not manufacture, sell, or distribute the Voltage Regulators; (ii) neither EMC nor AcBel suffered any physical harm; and (iii) there was no negligence because the Voltage Regulators passed all industry-standard testing prior to sale.

- The c. 93A Claims fail because the allegedly deceptive conduct at issue did not occur in Massachusetts.  While AcBel claims its injury occurred in the Commonwealth, the Supreme Judicial Court has clarified that situs of injury is irrelevant to the 93A analysis. The c. 93A Claims also fail because Defendants did not engage in a commercial transaction with AcBel or EMC.

        For these reasons, and as set forth in more detail below, the Court should enter summary

judgment in favor of Defendants on all counts of the AC.

---

[2] There is no jury demand in this case.
[3] This Memorandum groups AcBel's claims in the same manner as the Court's Order on Defendants' Motion to Dismiss (the "Order," Docket Entry # 43) using the following terminology:  (a) the "Contractual Warranty Claims," Counts 1-2 and 12-13; (b) the "Misrepresentation Claims," Counts 3-5; (c) the "Design Defect Claims," Counts 6-7 and 14-15; (d) the "Failure to Warn Claims," Counts 8-9 and 16-17; and (e) the "c. 93A Claims," Counts 10 and 18. <u>See</u> Order at 5.

# FACTS[4]

In 2008, Fairchild Shanghai redesigned the Voltage Regulator's silicon die. Because the redesign did not alter the chip's operating parameters, the Voltage Regulator's part number did not change. The redesigned Voltage Regulator passed all industry-standard qualification tests. Fairchild Korea notified Synnex of the design change, and Synnex, in turn, notified AcBel. AcBel did <u>not</u> notify EMC of the design change. <u>See</u> Facts ¶¶ 17-20.

In 2010, AcBel bought 195,000 of the redesigned Voltage Regulators (which cost $0.13 each) from Synnex for approximately $25,000. Defendants never owned the Voltage Regulators that AcBel purchased. The Voltage Regulators' chain of ownership began with Fairchild Korea (who built them), and ran through Fairchild Singapore (who bought them from Fairchild Korea), Fairchild HK (who bought them from Fairchild Singapore), Synnex (who bought them from Fairchild HK), to AcBel (who bought them from Synnex). <u>See</u> Facts ¶¶ 11-13, 24.

All of the Foreign Subsidiaries are independent corporate entities. Synnex is a worldwide electronics distribution corporation unaffiliated with the Defendants or the Foreign Subsidiaries. Synnex bought the Voltage Regulators from Fairchild HK pursuant to an arm's-length distribution contract that attached a limited warranty to all Fairchild-brand products that Synnex purchased.[5] AcBel knew about the contract (and the limited warranty) because Synnex acquired its distribution relationship with Fairchild HK from Teampo Technology Co. Ltd. ("Teampo"), an AcBel subsidiary, and Teampo acquired its distribution relationship with Fairchild HK from AcBel itself. The relationships and contracts between Teampo and Fairchild HK and AcBel and Fairchild HK were the same as those between Synnex and Fairchild HK.[6] <u>See</u> Facts ¶¶ 1-9.

---

[4] This section references Defendants' Rule 56.1 Statement of Undisputed Facts ("Facts ¶¶ __").
[5] Synnex and Fairchild HK terminated their contractual relationship in June 2012. <u>See</u> Facts ¶ 10.
[6] Indeed, AcBel began purchasing Voltage Regulators through Teampo during the period when Teampo was AcBel's subsidiary. <u>See</u> Facts ¶ 23.

In June 2010, Fairchild Korea stopped manufacturing the redesigned Voltage Regulators, although it continued to sell existing product inventory.  Fairchild Korea stopped manufacturing the redesigned Voltage Regulator because a customer reported problems with a similar shrunk-die product, and because the cost savings from the redesign proved insignificant. Because the reported problems appeared limited to a particular outdoor use, neither Defendants nor Fairchild Korea anticipated any impact on AcBel or any other user.  See Facts ¶¶ 21-22.

AcBel used the Voltage Regulators as components in Power Supply Units ("PSUs") which AcBel sold to EMC for use as components in Disk Array Enclosures ("DAEs").  The DAEs are components in information storage systems that EMC sold to its customers.  In December 2010, these systems allegedly began to fail at an increased rate, although these failures caused no injuries and no physical damage to property.  See Facts ¶¶ 25, 29, 34-35.

## ARGUMENT

## I.      THE CONTRACTUAL WARRANTY CLAIMS FAIL BECAUSE THERE WAS NO PRIVITY OF CONTRACT

To recover on a contractual warranty claim, a plaintiff must prove that the injured party and the defendant were in privity.  See Order  at 6 (citing Cruickshank v. Clean Seas Co., 346 B.R. 571, 580 (D. Mass. 2006)).  Defendants were not in privity with AcBel or EMC.

### A.      AcBel And EMC Did Not Contract With Defendants

EMC had no material dealings concerning the Voltage Regulators with the Defendants or any Foreign Subsidiary.  See Facts ¶¶ 26-28.   AcBel did not purchase Voltage Regulators from Defendants, and no sales contract concerning the Voltage Regulators exists between them.  See Facts ¶¶ 11-13.  Indeed, Defendants could not sell the Voltage Regulators to AcBel because Defendants never owned the Voltage Regulators.  The manufacturing and distribution chain was as follows:

WEST\269410124.1

- Fairchild Shanghai designed the Voltage Regulators.  See id. ¶ 12.

- Fairchild Korea manufactured and tested the Voltage Regulators, and sold them to Fairchild Singapore.  See id.

- Fairchild Singapore sold the Voltage Regulators to Fairchild HK.  See id.

- Fairchild HK sold the Voltage Regulators to Synnex.  See id.

- Synnex sold the Voltage Regulators to AcBel through Synnex's Hong Kong subsidiary. See id. ¶ 13.

- AcBel then placed the Voltage Regulators in its PSUs, which AcBel sold to EMC.  See id. ¶ 25.

Although AcBel argues that it "negotiated the price" of the Voltage Regulators with Defendants, these negotiations actually took place between AcBel, Synnex, and Fairchild HK. See Facts ¶¶ 11, 14.  Defendants, on the other hand, were bystanders to the entire set of transactions and stood apart from the manufacturing and distribution chain.  See id. ¶¶ 11-14. Under these circumstances, there can be no finding of privity between AcBel and Defendants. See, e.g., Xarras v. Whitney, No. 08 MISC 387228 AHS, 2011 WL 5590103, at *6 (Mass. Land Ct. Nov. 16, 2011) (defining privity as "[m]utual or successive relationship to the same rights of property") (quoting Brooks v. Sec'y of Commonwealth, 257 Mass. 91, 94 (1926)).  In short, "[t]here being no contract, obviously there can be no warranty . . . ."  Newton v. Rockwood & Co., 378 F.2d 315, 318 (1st Cir. 1967).

In a misguided effort to create privity where none exists, AcBel makes various allegations regarding ex post interactions involving Defendants.  Purported dealings with Defendants occurring long after AcBel's purchase of the Voltage Regulators do not create privity.  The relevant inquiry is whether there were direct dealings at the time of purchase.[7]  See Newton, 378 F.2d at 317 (no privity under Massachusetts law where there was no preexisting

---

[7] In any case, when AcBel first became aware of problems with the Voltage Regulators, it contacted Fairchild HK, not he Defendants.  See Facts ¶ 31.

sales contract with defendant, even though "defendant endeavored to remedy th[e] situation" upon complaint of a defective product); Paramount Farms Int'l LLC v. Ventilex B.V., 500 F. App'x 586, 588 (9th Cir. 2012) (no privity where parent company did not engage in "direct dealings" with plaintiff before plaintiff contracted with subsidiary); cf. White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 67 (1st Cir. 1970) (focusing on pre-purchase and immediate post-purchase activities).

     **B.**    **Synnex Was No One's Agent**

AcBel attempts to circumvent the privity requirement by asserting that Synnex was Defendants' "agent." This allegation is demonstrably false.

An agency relationship requires "control and consent." Balcor Co. v. Daejen (Massachusetts) Inc., No. 915839E, 1994 WL 879679, at *3 (Mass. Super. Mar. 30, 1994). There must be a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control." Kirkpatrick v. Boston Mutual Life Ins. Co., 393 Mass. 640, 645 (1985) (citation omitted). "Whether such an agency is formed depends on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 173 (D. Mass. 2002). "[A] court may find that no such relationship exists if there is no genuine issue of material fact." DiMaria v. Concorde Entm't, Inc., No. CIV. 12-11139-FDS, 2014 WL 991567, at *5 (D. Mass. Mar. 12, 2014) (rejecting agency theory of liability and entering summary judgment for defendant).

"Control and consent" are not present here. Neither Defendants nor any of the Foreign Subsidiaries had control over Synnex's conduct. See Facts ¶¶ 7-9; see also Balcor Co., No. 915839E, 1994 WL 879679, at *4 (unless plaintiff adduces evidence of "pervasive control and consent," agency liability "necessarily fail[s]"). Indeed, Synnex's contract with Fairchild HK

WEST\269410124.1

makes it abundantly clear that Synnex was an independent contractor.  See id. ¶ 7; Spencer v.
Doyle, 50 Mass. App. Ct. 6, 8-9 (2000) ("While the language in a contract is not determinative, it
is evidence of the extent of agency."); Restatement (Second) of Agency § 376 (1958).

Moreover, it is undisputed that Synnex was "alone responsible for the operation" of its
business.  DiMaria, 2014 WL 991567 at *4 (rejecting agency theory on summary judgment
where purported agent was "alone was responsible for the hiring, training, discipline, and
oversight of its . . . staff").  Synnex is a large, publicly listed multinational corporation in its own
right; as of 2013, Synnex and its subsidiaries employed over 5,200 individuals, and in 2012
Synnex generated NT$312.6 billion (approximately US$9.65 billion) in net sales.  See Facts ¶ 8.
Synnex distributes electronics products around the world for over 300 manufacturers.  See id.
Neither Defendants, nor Fairchild HK, nor any other Foreign Subsidiary has ever exercised any
control over Synnex's business operations or had any ownership interest in Synnex.  See id. ¶ 9.
Simply put, Synnex was conducting its own business, not Defendants' business.  Under these
facts, the Court could not conclude after a bench trial that Synnex is Defendants' agent.
McDermott's Case, 283 Mass. 74, 76 (1933) (agent is one which is "at every moment, with
respect to every detail [of the work] . . . bound to obedience and subject to direction and control,
as distinguished from a right of inspection and insistence that the contract be performed.").

Defendants anticipate that AcBel will rely heavily on White's Farm Dairy, Inc. v. De
Laval Separator Co., 433 F.2d 63 (1st Cir. 1970) to support its agency theory of liability.  As
noted above, however, there is no evidence of any relevant direct dealings between Defendants
and AcBel at the time AcBel purchased the Voltage Regulators.  See Facts ¶¶ 11-14, 30.  There
is also no evidence of control by Defendants over Synnex – let alone day-to-day control.  See
id. ¶¶ 8-9.  As such, the facts here do not resemble those in White's Farm.  In White's Farm, the

plaintiff dealt directly with the defendant-manufacturer's sales representative, rather than an independent dealer, over equipment and price.  433 F.2d at 64-65.  During these pre-purchase dealings, the sales representative promised that installation would be under "direct factory supervision."  Id. at 65-66.  The dealer was, according to the plaintiff, simply an "in between man" that "didn't dare open his mouth."  Id. at 66.  The defendant delivered all of the equipment itself, and its own sales representative assisted with the installation and then gave instructional courses to the plaintiff's employees.  Contrast AcBel Dep. at 105:18-107:2, 111:19-114:3 (Synnex handled ordering, shipping and delivery of Voltage Regulators to AcBel).[8]  The court reasoned that a jury "could find that . . . the manufacturer was in fact handling the deal." White's Farm, 433 F.2d at 67.  No such finding is possible here because, unlike in White's Farm, Defendants were not involved in the Voltage Regulator transactions.  See Facts ¶¶ 11-14.[9]

### C.    AcBel Cannot Pierce The Corporate Veil

AcBel may instead seek to hold Defendants liable on an "alter ego" theory for the alleged acts of the Foreign Subsidiaries.  "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries."  United States v. Bestfoods, 524 U.S. 51, 61 (1998) (internal quotation marks omitted).  The undisputed facts here do not warrant any deviation from this cardinal principle.

A parent company and its subsidiary are presumptively separate corporate entities. Devlin v. WSI Corp., 833 F. Supp. 69, 74 (D. Mass. 1993). "[C]ontrol, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities."  Scott v. NG U.S. 1, Inc., 450 Mass. 760, 767-68 (2008).  The plaintiff must first prove "pervasive control"

---

[8] The transcript of AcBel's 30(b)(6) designee is attached as Exhibit A to the Affidavit of Matthew H. Farmer ("Farmer Aff."), filed herewith.
[9] As noted above, post-transaction dealings between Defendants and AcBel are irrelevant.  The appropriate inquiry is the extent of involvement by the defendant-manufacturer in the purchase of the equipment at issue.  In this case, Defendants had none.

characterized by "fraudulent or injurious consequence of the intercorporate relationship," or "a confused intermingling of activity." My Baking Bread Co. v. Cumberland Farms. Inc., 353 Mass. 614, 619 (1968). Second, in only "rare circumstances," courts may allow a plaintiff to pierce the corporate veil of limited liability if necessary to "provide a meaningful remedy for injuries and to avoid injustice." Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 (2000).

There is no evidence that Defendants exercised pervasive control over the Foreign Subsidiaries, let alone that Defendants abused the privilege of doing business in the corporate form to commit a tort or wrong against AcBel or EMC. See 1 W.M. Fletcher, Cyclopedia of Corporations, 1 Fletcher Cyc. Corp. § 43 (April 2016) ("the injured party must show some connection between its injury and the parent's improper manner of doing business—without that connection, even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized"). Defendants did not – and do not – exercise any control over the activities of the Foreign Subsidiaries beyond what would normally be expected from a controlling stockholder in the context of a multinational corporation. See Facts ¶ 16. And there is no evidence of any "intermingling of activity . . . with a substantial disregard of the separate nature of the corporate entities." My Baking Bread, 353 Mass, at 619. To the contrary, each Foreign Subsidiary maintained a separate corporate existence and identity, had its own board of directors responsible for its management, and maintained its own separate assets and finances. See Facts ¶ 15. In light of these undisputed facts, AcBel cannot get past the first step of its veil-piercing analysis.

Further, veil-piercing is unnecessary to avoid injustice in this case. See OMV Assocs., L.P. v. Clearway Acquisition, Inc., 82 Mass. App. Ct. 561, 566 (2012) (no basis for veil-piercing where corporate relationship was not used to perpetuate fraud). There is no reason why AcBel

could not have pursued litigation against the entities who actually designed, manufactured, and distributed the Voltage Regulators.  They are not undercapitalized shell companies.  <u>See</u> Facts ¶ 15.  They are not insolvent.  <u>See</u> <u>id.</u>  There is no evidence that they would be unable to pay any judgment that might be entered against them.  <u>See</u> <u>id.</u>  AcBel elected to sue Defendants only because it desired a United States forum.  Forum-shopping is not a basis for imposing alter-ego liability.  <u>See, e.g.</u>, <u>R & R Chems., LLC v. Cellect, LLC</u>, No. 01-11623-PBS, 2002 WL 2018725, at *5-6 (D. Mass. Aug. 29, 2002) (listing factors in veil-piercing analysis, and noting that "piercing is the exception, not the rule," and that "plaintiffs must meet a very high standard before they will be allowed to disregard a corporate form") (quotations omitted).

## II.        ACBEL CANNOT PROVE ITS FRAUD CLAIM (COUNT 3)

A claim for fraud has five elements: "(1) representation, (2) falsity, (3) knowledge of falsity, (4) intent to deceive, and (5) reliance and resulting damage."  Order at 14.  AcBel suffers from a failure of proof as to at least the first, third, fourth, and fifth elements.

### A.        Defendants Made No Affirmative Representations To AcBel

AcBel has no evidence that Defendants made any actionable misrepresentation.  As the Court previously noted, "AcBel bases its fraud claim on the allegation that when Fairchild redesigned the Voltage Regulators, it did not change the part number as is customary in the industry."  Order at 14.  Assuming that assigning part numbers to the Voltage Regulators constitutes a representation[10], that representation did not come from Defendants.  Fairchild Korea assigned part numbers to the Voltage Regulators,  <u>see</u> Facts ¶ 12, and Defendants  made no other material representations to AcBel, <u>see</u> <u>id.</u> ¶ 30.

---

[10] Based on the Court's Order, Defendants assume for the purposes of summary judgment that a part number can be a representation.  <u>See</u> Order at 14-15.

In any event, AcBel was on notice of the design change because Synnex sent AcBel a process change notice ("PCN") regarding the Voltage Regulators in 2008.  See Facts ¶ 19. Whether a communication constitutes a misrepresentation is determined by examining all information provided to the plaintiff.  See, e.g., Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988) (reliance on one of two contradictory statements unreasonable as matter of law because "[t]he conflicting content of [the two statements] should have placed petitioner on notice that he should not rely on either statement").  Because AcBel received notice of the product change in writing, the Court could not conclude after a bench trial that the part numbers constituted a representation to the contrary.

**B.   Defendants Did Not Intend, Or Even Know Of, Any Misrepresentation**

Nor can AcBel demonstrate knowledge of falsity or intent.  Because Defendants did not redesign the Voltage Regulators, assign the Voltage Regulators' part numbers, or send the part numbers to AcBel, they could not possibly have known that not changing the part numbers misrepresented some material fact.  But even if Defendants were aware of the assigned part numbers, knew the numbers had not been changed, and knew that not changing the numbers constituted some sort of implied representation, there is still no evidence that Defendants knew or intended such representation to be false.  Pre-distribution testing demonstrated no defects and, thus, Defendants would have had no reason to believe the alteration was material.  See Facts ¶ 17.  And Defendants obviously could not have intended to induce reliance on a purported misrepresentation if they had not been aware that a misrepresentation had been made.

**C.   There Can Be No Falsity, Intent To Induce, Or Reasonable Reliance Because AcBel Was On Notice Of The Redesign**

The fraud claim also fails because, as noted above, AcBel was on notice of the design change.  It is uncontroverted that in October 2008 Synnex sent AcBel the PCN disclosing the

design change.  <u>See</u> Facts ¶ 19.  Accordingly, AcBel cannot show an implied misrepresentation

to the contrary.  Nor can AcBel prove that Defendants intended to deceive, or that AcBel was in

fact deceived, by the act of not changing part numbers when AcBel received documentation

disclosing the product change.  <u>See</u> <u>Nei v. Burley</u>, 388 Mass. 307, 310-11 (1983) (no fraud

where vendors failed to disclose existence of stream on property, where they had provided buyer

with report showing presence of excessive water and where buyer made no further inquiry);

<u>Logan Equipment Corp. v. Simon Aerials, Inc.</u>, 736 F. Supp. 1188, 1200 (D. Mass. 1990)

(plaintiff could not reasonably rely on written specifications of equipment because he had notice

of re-design).

## III.      THE FRAUDULENT OMISSION CLAIM (COUNT 4) AND NEGLIGENT MISREPRESENTATION CLAIM (COUNT 5) FALL WITH THE FRAUD CLAIM

AcBel's other Misrepresentation Claims – Counts 4 and 5 for fraudulent omission and

negligent misrepresentation – likewise fail.  "Fraud by omission requires both concealment of

material information and a duty requiring disclosure."  <u>JSB Indus., Inc. v. Nexus Payroll Servs.,</u>

<u>Inc.</u>, 463 F. Supp. 2d 103, 107 (D. Mass. 2006) (citation omitted).  Negligent misrepresentation

requires evidence that the defendant provided plaintiff with false information and failed "to

exercise reasonable care or competence in obtaining or communicating the information."  <u>Nota</u>

<u>Constr. Corp. v. Keyes Assoc.</u>, 45 Mass. App. Ct. 15, 20 (1998) (citation omitted).  AcBel cannot

establish these essential elements.

In its Order, the Court concluded that AcBel sufficiently alleged that Defendants had

superior knowledge regarding the redesign, that the redesign had not been disclosed to AcBel,

and that industry standards required Defendants to notify AcBel of the redesign or, at a

minimum, change the part number to put AcBel on notice of a design change."  Order at 17.  The

veracity of these allegations, however, has not withstood discovery.

## A.  There Is No Omission Or Misrepresentation On Which AcBel May Base Its Claims

As set forth above, AcBel cannot adduce evidence that Defendants communicated any representation – negligent or otherwise – because the alleged representation here was issued by a separate entity.  "[T]o establish its negligent misrepresentation claim, [AcBel] must also prove that [Defendants] knew, or reasonably should have known, that the representations were false <u>at the time they were made</u>."  <u>Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc.</u>, 263 F. Supp. 2d 140, 149 (D. Mass. 2003).  Defendants did not participate in issuing the part numbers and were unaware of whatever alleged representation or omission the part numbers implied.  But even if one were to adopt AcBel's reimagined version of events in which Defendants had knowledge regarding the part numbers, the negligence claim would still fail.  AcBel alleges it is "customary" to alter part numbers when there is a design change.  <u>See</u> AC ¶ 40.  In fact, it is only customary to do so when the operation parameters of the part change. <u>See</u> Facts ¶ 18.  Accordingly, even assuming Defendants made any decision regarding the part numbers – and they did not – their conduct was entirely consistent with industry custom.  <u>See id.</u> ¶¶ 18-19.

## B.  There Is No Evidence That Defendants Had "Superior Knowledge"

The evidence is undisputed that, at the time of AcBel's purchase, Defendants had no knowledge of a material design change that could impact AcBel, and no knowledge of an actual defect.  <u>See</u> Facts ¶¶ 17, 22.  Subsequently, in June 2010, Fairchild Korea decided to discontinue manufacturing of the shrunk-die Voltage Regulator because of reports of issues with another shrunk-die product – the LM7805CT – from another customer, and because the manufacturing benefits that resulted from shrinking the die were insignificant.  The LM7805CT product was similar to, but not the same as, the Voltage Regulator, and, unlike the Voltage Regulator, had

been used in outdoor solar panels, not in power supply units.  Importantly, at the time that

Fairchild Korea stopped manufacturing the shrunk-die Voltage Regulators, neither Defendants

nor the Foreign Subsidiaries were aware of any functionality issues with the shrunk-die Voltage

Regulators that AcBel had purchased from Synnex, and they did not anticipate any impact to

AcBel or anyone else that purchased the Voltage Regulators.  See id. ¶¶ 21-22.

Further, there can be no showing of "superior knowledge" because Synnex disclosed the

design change to AcBel.  See Facts ¶ 19.  The trier of fact must consider the totality of

information provided to AcBel, not simply the information AcBel elected to read.  NPS, LLC v.

Ambac Assur. Corp., 706 F. Supp. 2d 162, 179 (D. Mass. 2010) (granting summary judgment on

negligent misrepresentation claim where plaintiff "had reason to know" the allegedly withheld

fact).  A person has "notice of a fact when, from all the information at his disposal, he has reason

to know of it."  Demoulas v. Demoulas Supermarkets, Inc., 424 Mass. 501, 508 (1997) (citation

omitted).  That AcBel may have disregarded the parts change notice and ignored the information

it received does not create an issue of fact on these claims.

## IV.       THE ECONOMIC LOSS RULE BARS ACBEL'S NEGLIGENCE, STRICT LIABILITY, AND NEGLIGENCE-BASED C. 93A CLAIMS

The economic loss rule "provides that purely economic losses are not recoverable in

negligence and strict liability actions in the absence of personal injury or damage to property

other than the product itself."  Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 89 (D. Mass.

1998).  The economic loss rule also bars negligence-based c. 93A claims.[11]  At the pleading

stage, the Court concluded that there were sufficient allegations of damage to "other property" to

---

[11] See Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 998 (1st Cir. 1992) ("Tort law. . . does not normally permit a plaintiff to recover purely economic losses caused by the negligence of another person. [P]laintiffs have given us no reason to think . . . that Chapter 93A would reach beyond the traditional rule in a tort-based action."); Hooper v. Davis-Standard Corp., 482 F. Supp. 2d 157, 159 (D. Mass. 2007) (holding that "[i]n Massachusetts, claims of negligence and breach of implied warranty are strict liability claims, which in the absence of personal injury or property damage, are barred by the economic loss doctrine . . . [and] in the absence of personal injury or property damage . . . M.G.L ch. 93A claims are barred by the economic loss doctrine").

evade the rule.  Order at 10.  Discovery has demonstrated that there is no evidence to support that notion, as the Voltage Regulator did not injure anyone or damage anything.  See Facts ¶ 34.[12]

AcBel will likely argue that a "property damage" exception to the economic loss rule should apply in a small number of instances where the replacement of a Voltage Regulator in a PSU caused another Voltage Regulator in a paired PSU within the same DAE to fail during replacement.  See Facts ¶ 35.  To the extent that this is "damage,"[13] it does not trigger an exception to the economic loss rule because it is not damage to "other property."

It is settled law that the property damage exception to the economic loss rule does not apply if the product was part of an integrated system: "Damage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property.'"  Superior Kitchen, Inc., 263 F. Supp. 2d at 145; Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 883 (1997) (reaffirming rule that "a user might recover for damage a defective component causes the manufactured product, other than the component itself"); Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 850 (6th Cir. 2002) (rejecting argument that individual component part sold by defendant to plaintiff was the "product" for purposes of the economic loss rule because then "nearly any component part would be a product and we would, as a result, effectively eviscerate the distinction between contract and tort law").

This Court previously ruled that, from the "purchaser's perspective," the product at issue was the component part.  Order at 10.  Defendants respectfully submit that the "purchaser's perspective" does not alter the integrated system analysis.  Sebago, the decision upon which this

---

[12] When a Voltage Regulator failed AcBel simply replaced it with a new one and repackaged the PSU that contained it.  See AcBel Dep. at 149:24-150:7.
[13] Even when both PSUs failed, the DAE that contained them would function perfectly once they were replaced.  See EMC 30(b)(6) Dep. at 93:2-95:11, copy attached as Exhibit B to Farmer Aff.

WEST\269410124.1

Court relied, clarified that even under the "purchaser's perspective," the individual component in that case (roof insulation) was <u>not</u> the relevant product because it "was purchased to be installed and to become integrated with the building.  It is a component of the building, and has no use to the plaintiffs otherwise."  18 F. Supp. 2d. at *92-93.

<u>Sebago</u> represents a straightforward application of the integrated systems rule:  "When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself."  Restatement (Third) of Torts: Prod. Liab. § 21 cmt. e (1998); Ralph C. Anzivino, <u>The Economic Loss Doctrine: Distinguishing Economic Loss from Non-Economic Loss</u>, 91 Marq. L. Rev. 1081, 1088-89 (2008) (under integrated systems rule, "when the defective product is a component part of a machine or system and the defective product damages the machine or system," this is not damage to "other property").  The district court in <u>Superior Kitchen</u> applied the integrated system rule to reject a similar "other property" argument, finding that "it is difficult to fathom how the [defendant's] products consisting of stains, top coats and sealers can be characterized other than as integrated, indistinguishable components of the finished cabinets which were purchased by [plaintiff's] customers."  263 F. Supp. 2d at 145.  "A contrary holding" – <u>i.e.</u>, one in which courts define the product from the manufacturer-defendant's perspective and look exclusively at the individual component sold – "would require a finding of property damage in virtually every case in which a product harms itself and would prevent contractual rules from serving their legitimate function in governing commercial transactions."  Restatement (Third) of Torts: Prod. Liab. § 21 cmt. e (1998).

In this case, it is undisputed that AcBel purchased the Voltage Regulators to install them as integrated components in the PSUs.  <u>See</u> Facts ¶ 25.  It is equally undisputed that the PSUs were integral components of DAEs which, in turn, were integrated into information systems sold

by EMC.  See id.  While the "property damage" exception to the economic loss rule might apply

if, for example, a Voltage Regulator failure caused a fire that damaged a building owned by

EMC's customer, it does not apply where, as alleged here, the failure of one component triggers

the failure of a second component of the same integrated system.

## V.     THE DESIGN DEFECT AND FAILURE TO WARN CLAIMS FAIL FOR MULTIPLE INDEPENDENT REASONS

As noted above, the economic loss rule bars each of AcBel's redundant and overlapping

design defect claims.  These claims also fail for additional, independent reasons.  As an initial

matter, Defendants had no duty to warn anyone and could not have been strictly liable for the

Voltage Regulators because Defendants did not manufacture them.  See Facts ¶ 11; Mathers v.

Midland-Ross Corp., 403 Mass. 688, 691 (1989) (upholding summary judgment in favor of

defendant who did not manufacture defective product because "[a] plaintiff who sues a particular

manufacturer for product liability generally must be able to prove that the item which it is

claimed caused the injury can be traced to that specific manufacturer").

Next, AcBel's strict liability-based Design Defect Claims are "congruent in nearly all

respects with the principles expressed in the Restatement (Second) of Torts § 402A."  Johnson ex

rel. Estate of Johnson v. Brown & Williamson Tobacco Corp., 345 F. Supp. 2d 16, 20 (D. Mass.

2004) (citation omitted).  Section 402A defines the strict liability of: (1) "a seller;" (2) for

"physical harm to a user or consumer of the seller's product."  Correia v. Firestone Tire &

Rubber Co., 388 Mass. 342, 353 (1983) (citing Back v. Wickes Corp., 375 Mass. 633, 640

(1978)).  These elements are not satisfied here, as it is undisputed that the Voltage Regulator

failures caused no physical harm to any person or property.  See Facts ¶ 34.

For similar reasons, summary judgment is warranted on AcBel's negligence-based

Design Defect Claims.  These claims require a showing that Defendants owed AcBel and EMC a

legal duty.  See Davis v. Westwood Grp., 420 Mass. 739, 742-43 (1995).  AcBel and EMC

cannot demonstrate any legal duty because, as noted above, independent corporate entities

designed, sold and manufactured the Voltage Regulators.  AcBel's negligence claim would fail

in any event because Fairchild Korea ran all of the standard qualification tests typical for a

component of this sort and the Voltage Regulators passed all of those tests.  See Facts ¶¶ 12, 17.

Defendants had no legal duty to disclose risks which they could not have reasonably foreseen.

See Vassallo v. Baxter Healthcare Corp., 428 Mass. 1, 19-23 (1998) (manufacturer cannot be

held liable for failing to disclose risks that were "not reasonably foreseeable at the time of sale or

could not have been discovered by way of reasonable testing prior to marketing the product").

## VI.    THE C. 93A CLAIMS FAIL BECAUSE THE ALLEGED DECEPTIVE ACTS DID NOT OCCUR IN MASSACHUSETTS AND BECAUSE DEFENDANTS DID NOT ENGAGE IN A TRANSACTION WITH ACBEL OR EMC[14]

Chapter 93A, § 11, states that "[n]o action shall be brought or maintained under this

section unless the actions and transactions constituting the alleged unfair method of competition

or the unfair or deceptive act or practice occurred primarily and substantially within the

commonwealth."  The c. 93A Claims in this case fail because: (a) the alleged deceptive acts did

not occur "primarily and substantially within" Massachusetts; and (b) there was no transaction

between Defendants and either AcBel or EMC.

The gravamen of the c. 93A Claims is that Defendants purportedly concealed and failed

to disclose a known design defect in the Voltage Regulators and sold the Voltage Regulators in

breach of implied or express warranties.  See Order at 13 (quoting AC ¶¶ 249, 251).  None of

these alleged practices occurred in Massachusetts.  No employee of any Fairchild entity that

---

[14]  AcBel's negligence-based c. 93A claims are barred by the economic loss rule, see supra Part IV, and its fraud-based c. 93A claims fail because under Chapter 93A because "[t]here is no liability for failing to disclose what a person does not know."  Augat, Inc. v. Collier, No. CIV. A. 92-12165-RCL, 1996 WL 110076, at *19 (D. Mass. Feb. 8, 1996) (citation omitted).  As set forth above, see supra Part II, Defendants were unaware of any representation, let alone the falsity of any such representation.

lived or worked in Massachusetts ever had any substantive involvement with the Voltage Regulators.  See Facts ¶ 33.  The redesign took place in China.  See id. ¶¶ 12, 17.  The testing occurred in South Korea.  See id.  Prior to AcBel's failure report in December 2010, the only communications between AcBel and a Fairchild entity concerning the Voltage Regulators involved employees of the Foreign Subsidiaries located in South Korea, Taiwan, and Hong Kong.  See id. ¶ 30.  The employees who investigated the alleged failures following AcBel's failure report were based in Maine, California, Florida, and Texas.  See id. ¶ 32.  In short, no relevant conduct occurred in Massachusetts.

True, federal courts did at one time hold that a 93A claim "attacked via a motion to dismiss, should survive a 'primarily and substantially' challenge so long as the complaint alleges that the plaintiff is located, and claims an injury, in Massachusetts."  Back Bay Farm, LLC. v. Collucio, 230 F. Supp. 2d 176, 188 (D. Mass. 2002) (citation omitted).  That is no longer the law.  The Supreme Judicial Court has since clarified that under the plain text of c. 93A § 11, it is the unfair practice, not the injury, that forms the center of gravity that must "occur[] primarily and substantially within" Massachusetts.  Kuwaiti Danish Comput. Co. v. Digital Equip. Corp., 438 Mass. 459, 474 (2003) (reversing trial court and granting summary judgment for defendant where judge considered Massachusetts connections other than deceptive acts or practices because such facts "cannot be considered on the question whether the wrongful conduct occurred 'primarily and substantially' in Massachusetts").  The SJC's holding controls here.  Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 235 (1st Cir. 2003) ("[W]e must follow the SJC's pronouncements on interpretations of Massachusetts statutes.  Therefore, we evaluate whether the conduct occurred 'primarily and substantially within the Commonwealth' under the 'center of gravity' test announced in Kuwaiti Danish Computer Co.").  Because it is undisputed

-19-

that the allegedly <u>deceptive</u> acts at issue here did not occur in Massachusetts, the c. 93A Claims

fail.  <u>See</u> <u>Kenda Corp.</u>, 329 F.3d at 236 ("As the SJC recognized in <u>Kuwaiti Danish Computer</u>

<u>Co.</u>, when 'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the

Commonwealth, there can be no Chapter 93A liability.").

 The c. 93A Claims also fail because they do not arise from a transaction between the

Defendants and either AcBel or EMC.  As this is not a claim based on unfair competition,

"[l]iability under . . . G.L. c. 93A, § 11, 'requires that there be a commercial transaction between

a person engaged in trade or commerce [and] another person engaged in trade or commerce."

<u>Stop & Shop Supermarket Co. v. Loomer</u>, 65 Mass. App. Ct. 169, 174-75 (2005), <u>quoting</u> <u>Szalla</u>

<u>v. Locke</u>, 421 Mass. 448, 451 (1995); <u>John Beaudette, Inc. v. Sentry Ins. a Mutual Co.</u>, 94 F.

Supp. 2d 77, 124 (D. Mass. 1999) (courts "require a transactional business relationship between

the parties in order to maintain a section 11 claim").  In this case, the Defendants did not engage

in <u>any</u> commercial transaction with AcBel or EMC concerning the Voltage Regulators.  <u>See</u>

Facts ¶¶ 11, 26.

 This is dispositive.  Although this Court held at the motion to dismiss stage that "AcBel

has alleged sufficient facts to infer a sufficient business nexus," Order at 13 (citation omitted),

"only <u>after</u> it has been established that a 'commercial transaction' exists does the court address

whether the individuals were acting in a 'business context' and apply the business context test,"

<u>Stop & Shop</u>, 65 Mass. App. Ct. at 175 (emphasis added).  That is not the case here.

## **CONCLUSION**

 For the reasons set forth above, the Court should enter summary judgment in favor of

Defendants on all claims.

WEST\269410124.1

Dated: May 9, 2016

Respectfully submitted,

Fairchild Semiconductor International, Inc. and
Fairchild Semiconductor Corporation

By their attorneys,

/s/ Matthew J. Iverson

Matthew J. Iverson (BBO No. 653880)
Matthew H. Farmer (BBO No. 684771)
DLA PIPER LLP (US)
33 Arch Street, 26th Floor
Boston, MA  02110-1447
Telephone:     617.406.6000
Facsimile:     617.406.6100
matthew.iverson@dlapiper.com
matthew.farmer@dlapiper.com

Jeffrey A. Rosenfeld (CA Bar No. 136896)
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Tel. 310.595.3000

## CERTIFICATE OF SERVICE

I, Matthew J. Iverson, hereby certify that a true copy of the foregoing document filed
through the ECF system will be sent electronically to the registered participants as identified on
the Notice of Electronic Filing, and paper copies will be sent by first-class mail to those
indicated as non-registered participants on May 9, 2016.

/s/ Matthew J. Iverson

WEST\269410124.1