UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
                                        )
**ACBEL POLYTECH INC.,**                )
                                        )
          *Plaintiff,*                  )
                                        )
          **v.**                        )
                                        )     **Civil Action No.: 13-cv-13046**
                                        )
**FAIRCHILD SEMICONDUCTOR**             )
**INTERNATIONAL, INC. and FAIRCHILD**   )
**SEMICONDUCTOR CORPORATION,**          )
                                        )
          **Defendants.**               )
_____ )

<u>**MEMORANDUM AND ORDER**</u>

**CASPER, J.**                                    **December 9, 2016**

**I.      Introduction**

  Plaintiff, AcBel Polytech, Inc. ("AcBel"), on its own behalf and as assignee of EMC Corporation ("EMC"), filed this lawsuit against defendants, Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation (collectively, "Fairchild"), alleging various claims of breach of warranty, design defect, failure to warn, fraud, negligent misrepresentation, fraudulent omission and violations of Mass. Gen. L. c. 93A.  D. 7.  Fairchild moves for summary judgment.  D. 211.  For the reasons stated below, the motion is DENIED IN PART and ALLOWED IN PART.

**II.     Standard of Review**

  A moving party is entitled to summary judgment where there is no genuine dispute as to any material fact.  Fed. R. Civ. P. 56(a).  Material facts are those that carry the potential "to affect the outcome of the suit under the applicable law."  <u>Santiago–Ramos v. Centennial P.R. Wireless</u>

Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.

1996)).  The burden of demonstrating with evidence that there exists no genuine issue of material

fact belongs to the moving party.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-

moving party may not rely exclusively upon the allegations or denials in her pleadings.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Instead, the nonmoving party "must, with respect

to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact

could reasonably resolve that issue in her favor."  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605

F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is

'significant[ly] probative.'"  Id. (alteration in original)(quoting Anderson, 477 U.S. at 249).  In

conducting this inquiry, the Court "view[s] the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir.

2009).

## III.    Factual Background

Unless otherwise noted, the following facts are drawn from the parties' statements of

material facts, D. 213; D. 221, and are undisputed.

AcBel, a Taiwanese company with facilities in Massachusetts, designed and manufactured

power supply units ("PSUs").  D. 213 ¶ 25; D. 221 ¶ 25.  As AcBel alleges, PSUs supply a

consistent stream of power to certain high-end data storage devices, and when necessary, provide

an uninterruptible power supply in the event of a power failure.  D. 7 ¶¶ 2, 31.  That is, the PSUs

maintain a consistent output of volts or electrical power to prevent power surges from damaging

the larger electronic device.  Id. ¶ 33.  One microcircuit component AcBel incorporated into the

PSUs was a voltage regulator referred to as part KA7805ERTM ("Voltage Regulator").  D. 213 ¶

25; D. 221 ¶ 25.  EMC purchased the PSUs from AcBel.  D. 213 ¶ 25; D. 221 ¶ 25.  EMC used the

PSUs that AcBel manufactured as component parts its disk array enclosures ("DAE"), which are

information storage systems.  Id.  EMC then sold the DAEs to its own customers.  Id.

 In or around 2008, the Voltage Regulators that AcBel used as a component part in its PSUs

were redesigned.  D. 213 ¶ 17; D. 221 ¶ 17.  In particular, the silicon die containing the integrated

circuit within the Voltage Regulators was redesigned to shrink the die.  Id.  On or about September

13, 2008, Synnex Electronics Hong Kong Ltd. ("Synnex"), a company in Taiwan that distributes

electronic products worldwide, sent a process change notification ("PCN") concerning the Voltage

Regulator redesign to AcBel.  D. 213 ¶ 19; D. 221 ¶ 19.  In 2010, AcBel purchased approximately

195,000 redesigned Voltage Regulators from Synnex.  D. 213 ¶ 24; D. 221 ¶ 24.  At some point in

late 2010, EMC's customers began reporting DAE failures.  D. 213 ¶ 29; D. 221 ¶ 29.  AcBel

attributed the DAE failures to the redesigned Voltage Regulator.  D. 213 ¶ 29; D. 221 ¶ 29.  AcBel

did not pass the PCN along to its customer EMC until after EMC began reporting Voltage

Regulator failures.  D. 213 ¶ 20; D. 221 ¶ 20.

 In June 2010, the redesigned version of the Voltage Regulators was discontinued.  D. 213

¶¶ 21-22; D. 221 ¶¶ 21-22.  For manufacturing purposes, the Voltage Regulator was returned to

its original design with the larger die.  Id.  According to AcBel, the redesigned Voltage Regulators

were defective and caused AcBel and EMC harm.  D. 7.  AcBel contends that the redesigned

Voltage Regulators did not perform in humid environments.  D. 221 ¶ 21.  AcBel further asserts

that the Voltage Regulator's part number was not changed when the Voltage Regulators were

redesigned.  D. 213 ¶ 18.

 The parties dispute the relationship between the entities that were involved in the design,

manufacture and sale of the Voltage Regulators.  D. 213 ¶¶ 12, 15; D. 221 ¶¶ 12, 15.  AcBel

contends that Fairchild designed, manufactured and sold the Voltage Regulators to AcBel.  D. 221 ¶ 12.  Fairchild, however, contends that it had no relevant contractual relationship with AcBel and did not participate in any negotiation of the terms of sale of the Voltage Regulators to AcBel.  Id. ¶ 11.  According to Fairchild,  a  set of separate and independent corporate entities – Fairchild Semiconductor Hong Kong Ltd., Teampo Technology Co., Ltd., Fairchild Semiconductor Technology (Shanghai) Co., Ltd., Fairchild Korea Semiconductor Ltd., Fairchild Semiconductor (Suzhou) Co. Ltd. (collectively, the "Foreign Subsidiaries") – designed, manufactured, packaged and assigned part numbers to the Voltage Regulators.  D. 213 ¶ 12.  According to Fairchild, the Foreign Subsidiaries sold the Voltage Regulators to Synnex and Synnex, in turn, sold the Voltage Regulators to AcBel.  Id. ¶¶ 12-13.

In connection with an agreement to resolve their dispute regarding the PSU failures, EMC assigned its claims against Fairchild to AcBel.  D. 7 ¶¶ 80-81.  AcBel herein asserts claims on its own behalf as well as EMC's claims.

## IV.     Procedural History

AcBel commenced this action on November 27, 2013, D. 1, and later amended its complaint.  D. 7.  AcBel asserted claims of breach of warranty on its own behalf and on EMC's (Counts I, II, XII and XIII); claims for fraud and negligent misrepresentation on its own behalf (Counts III, IV and V); claims of "design defect – implied warranty/strict liability" on its own behalf and on EMC's (Counts VI and XIV); claims of "design defect – negligence" on its own behalf and on EMC's (Counts VII and XV); claims of "failure to warn – implied warranty/strict liability" on its own behalf and on EMC's (Counts VIII and XVI); claims of "failure to warn – negligence" on its own behalf and on EMC's (Counts IX and XVII); claims of a violation of Mass. Gen. L. c. 93A on its own behalf and on EMC's (Counts X and XVIII); and claims for punitive

damages on its own behalf and on EMC's (Counts XI and XIX).  On February 28, 2014, Fairchild

moved to dismiss all of AcBel's claims.  D. 17.  The Court denied the motion to dismiss as to all

but the claim for "punitive damages" which was dismissed.  D. 43.  Fairchild now moves for

summary judgment on all of the remaining claims.  D. 211.  Fairchild also moves to strike Jesse

T. Conan's affidavit, D. 245, and to strike references to settlement agreements.  D. 246.  The Court

heard the parties on the then pending motions and took these matters under advisement.  D. 251.

## V.      Discussion

### A.      Fairchild Is Not Entitled to Summary Judgment on AcBel's Contractual Warranty Claims

Fairchild argues that it is entitled to summary judgment on the breach of warranty claims

in Counts I, II, XII and XIII because there was no privity of contract between AcBel and Fairchild

or between EMC and Fairchild.  D. 211; D. 212 at 5.

In Fairchild's view, there is no privity because neither AcBel nor EMC had a contract with

Fairchild and Fairchild did not sell the Voltage Regulators to EMC or AcBel.[1]  D. 212 at 5-6.

According to Fairchild, a conglomerate of foreign entities manufactured, tested and ultimately sold

the Voltage Regulators to AcBel.  Id. at 6.  More specifically, Fairchild describes the chain of

distribution as follows:  (1) Fairchild Korea manufactured and tested the Voltage Regulators,

which Fairchild Korea then sold to Fairchild Singapore; (2) Fairchild Singapore sold the Voltage

Regulators to Fairchild Hong Kong; (3) Fairchild Hong Kong sold the Voltage Regulators to

Synnex; and (4) Synnex sold the Voltage Regulators to AcBel through Synnex's Hong Kong

subsidiary.  Id.  AcBel asserts that privity exists between Fairchild and AcBel because (1) Synnex

---

[1]  Given that, for all relevant purposes, the parties do not distinguish between AcBel's own claims and the EMC claims that AcBel also asserts in their respective arguments, the Court's analysis throughout this opinion applies to both EMC and AcBel's claims.

was Fairchild's agent, D. 220 at 15; and (2) Fairchild and the Foreign Subsidiaries disregarded corporate formalities and were engaged in a common enterprise, id. at 8.

Breach of warranty claims under Massachusetts law require privity of contract between the parties. See Cruickshank v. Clean Seas Co., 346 B.R. 571, 580 (D. Mass. 2006) (quoting Irish Venture, Inc. v. Fleetguard, Inc., 270 F. Supp. 2d 84, 87 (D. Mass. 2003) (noting that "privity of contract is required in implied warranty claims regarding commercial transactions"). "[L]ack of privity is an absolute defense to an action for breach of warranty." White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 66 (1st Cir. 1970). Synnex was the direct signatory to the purchasing agreement with AcBel for the Voltage Regulators. D. 213 ¶ 24; D. 221 ¶ 24. In the absence of a contract between the plaintiff and defendant, privity may be reasonably found where the third-party signatory on the contract with the plaintiff acted as an agent of the defendant. See White's Farm Dairy, Inc., 433 F.2d at 66. Where a third party administers the contract on behalf of the defendant and the defendant retains control of the dealings, privity may exist between the plaintiff and defendant as to that contract. Id. This holds true even if the third party functions as an independent entity outside of that particular context. Id. at 67.

More specifically, "[a]n agency relationship is created when there is mutual consent, express or implied, that the agent is to act on behalf and for the benefit of the principal, and subject to the principal's control." Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 742 (2000) (citing Kirkpatrick v. Bos. Mut. Life Ins. Co., 393 Mass. 640, 645 (1985)). A principal has liability for an agent's acts where those acts are within the authority of the principal in the transaction. See Smith v. Jenkins, 718 F. Supp. 2d 155, 165 (D. Mass. 2010) (citation omitted). Under the apparent authority doctrine, even if the authority is not expressly granted, a principal/agent relationship may exist and liability may be imposed upon the principal where the third party reasonably believes the

agent is authorized to act on behalf of the principal and "that belief is traceable to the principal's manifestations."  RFF Family P'ship, LP v. Link Dev., LLC, 907 F. Supp. 2d 155, 161 (D. Mass. 2012) (citing Smith v. Jenkins, 718 F. Supp. 2d 155, 165 (D. Mass. 2010)).  Whether an entity is an agent of another under a particular set of facts is ordinarily a question for the factfinder.  See White's Farm Dairy, Inc., 433 F.2d at 66 (citing Stern v. Lieberman, 307 Mass. 77, 81 (1940)).  In resolving this issue, the factfinder must consider all of the evidence and the reasonable inferences that can be drawn therefrom.  See id. at 66 (citing Bradley v. Meltzer, 245 Mass. 41, 43 (1923)).

### 1.   A Genuine Issue of Material Fact Exists as to Whether Synnex Was Fairchild's Agent

A genuine issue of material fact as to whether Fairchild was in control of the contract between Synnex and AcBel and whether Synnex was acting as Fairchild's agent precludes summary judgment.  It is undisputed that AcBel purchased the Voltage Regulators from Synnex. D. 213 ¶ 13; D. 221 ¶ 13.  AcBel, however, asserts that it understood Fairchild to be in control of the business relationship, D. 221 ¶¶ 13-16, and produces evidence that AcBel's belief was "traceable to [Fairchild's] manifestations."  RFF Family P'ship, 907 F. Supp. 2d at 161.

### a.   Evidence of Direct Dealings between Fairchild and AcBel Support a Reasonable Inference that Fairchild Was In Control of the Business Relationship with AcBel

To support its contention that Fairchild was in control of the relationship with AcBel, AcBel has produced evidence showing that Fairchild referred to AcBel as a customer, Fairchild discussed prices with AcBel, AcBel reported its product-related concerns to Fairchild and Fairchild addressed those concerns.

### i.   Evidence that Fairchild Referred to AcBel as a Customer

AcBel points to evidence that Fairchild repeatedly referred to AcBel as a key customer and discussed strategies for maintaining the relationship with AcBel.  In a December 2009 email

Fairchild employees coordinated a trip for Mark Kipp ("Kipp"), a Fairchild employee, to visit Asia and meet with "power supply customers." [2]  D. 222-24 at 5.  AcBel was named as one of the customers that Kipp visited while in Taiwan.  D. 222-24 at 3.  In addition to the fact that the email refers to AcBel as a "power supply customer," it also suggests that the meetings included employees who were not based in Asia but were instead only visiting Asia.  A reasonable fact finder could thus infer that this meeting – and the relationship with AcBel by extension – was not limited to Synnex or the Foreign Subsidiaries, contrary to Fairchild's contentions.  Similarly, in an email thread entitled "ACBEL/FAIRCHILD Meeting Minutes" Ricky Tuazon of AcBel wrote on April 12, 2010, "Fairchild has provided Class A part to key customers such as AcBel."   D. 223-9 at 2.  Still more, in a June 25, 2010 email, Allan Lam ("Lam"), a Fairchild employee, named AcBel as one of those "priority customers."  D. 222-25 at 2.  Lam instructed that resources should be "divert[ed]" as needed to "help . . . accounts" like AcBel.  Id.  These emails support the inference that AcBel was Fairchild's priority customer, the corporations had a direct relationship and that the relationship was significant to Fairchild because AcBel, *inter alia*, presented business development potential and required diversion of resources.

### ii.     Evidence that Fairchild Directly Communicated with AcBel regarding Prices

[2]  In considering the emails that have been produced during discovery, the Court assumes, for the purposes of this motion, that the "Fairchild" referred to in emails includes the defendant (U.S based) Fairchild unless it is clear from the face of the email that only the Foreign Subsidiaries are being discussed.  Similarly, the Court assumes that the individuals with generic Fairchild email addresses are tied to the defendant (U.S. based) Fairchild unless it is clear from the signature block in the email that the employee works for one of the Foreign Subsidiaries.  The Court does not rely upon those emails in which it is clear that the individuals in the email were based in the Foreign Subsidiaries and that there is no explicit discussion of the defendant (U.S. based) Fairchild.  This treatment is consistent with the Court's obligation to "constru[e] the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor."  Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002).

AcBel points to evidence that Fairchild engaged in price negotiations with AcBel.  An August 2010 email suggests that Fairchild and AcBel met to discuss prices. D. 222-27 at 2. In that email, which had the subject line ""pricing up in 2H '2010," Alan Lo shared with several Fairchild employees the notes from the meeting.  Id. at 2.  According to the email, the meeting concerned "FCS Y10'2H price negotiation."  Id.  The email noted that "FCS raise price dollar amount impact in AcBel is around US$670K in 2H'10."  Id.  As further indication that the meeting with AcBel concerned price negotiation, the email notes that "AcBel GM David requests to minimize the price gap of FCS non-focus linear items due to they need more time for second source approval by end customers."  Id.  This email suggests that AcBel and Fairchild directly communicated regarding essential terms of their business relationship and gives rise to a reasonable inference that, even if it is not clear that this particular meeting related to the Voltage Regulators, AcBel and Fairchild discussed prices in their general course of dealing, including potentially as to the purchase of the Voltage Regulators.  See Binkley Co. v. E. Tank, Inc., 831 F.2d 333, 337 (1st Cir. 1987) (recognizing that "[t]he court can decide that an agent had apparent authority to conduct a transaction on the basis of statements, conduct, course of dealing and other manifestations of the principal's consent that would lead a third party of reasonable prudence in the business to rely on the agent's authority").

### iii.    Evidence that Fairchild Responded to the Voltage Regulator Failures that AcBel Experienced

Email correspondence demonstrates that AcBel turned to Fairchild for support when AcBel became aware of the defects in the redesigned Voltage Regulators.[3]  For instance, in a March 24,

---

[3] In fact, while Fairchild denies any direct dealings with AcBel prior to AcBel reporting defects in the redesigned Voltage Regulators, Fairchild appeared to concede that it was involved in resolving AcBel's difficulties with the redesigned Voltage Regulators.  D. 213 ¶¶ 32.

2010 email John Lin ("Lin"), a Fairchild employee, wrote "I will go to AcBel this afternoon later for gathering those samples (0939 date code), to send them back to our factory and get further analysis result for that."  D. 223-9 at 21.

The record contains further evidence that Fairchild was involved in addressing AcBel's concerns:  AcBel points to a December 22, 2010 letter from Eric Hertz ("Hertz") to "Customer" in which Hertz writes, "Fairchild Semiconductor Corporation ('Fairchild') would like to confirm what we have stated in PQA 2010500086 to ensure that all shrink die KA7805ERTM switch back to non shrink die from 1035 date code."  D. 222-16 at 2.  This letter indicates that Fairchild worked to ensure that all "shrink die" was returned to "non shrink die," the very design change that is alleged to have led to the defective Voltage Regulators.  A reasonable fact finder might conclude that Fairchild not only participated in the response to the defectively redesigned Voltage Regulators but also that Fairchild led or managed those efforts from the outset.  See, e.g., Moussa v. Abdel-Kader, No. 98-cv-5084-RDG, 2000 WL 1736942, at *2 (Mass. Super. Nov. 20, 2000) (explaining that the defendant's instructions to the third party that were aimed at "protect[ing] the quality associated with [the defendant's] trademark" raised a genuine issue of material fact as to whether the third party was the defendant's apparent agent).

Significantly, the record contains discussions that suggest that Fairchild was motivated to address AcBel's product-related concerns because such intervention was a part of Fairchild's larger responsibility for managing AcBel as a customer.  In a 2011 email, Eric Lan ("Lan") wrote to Dan Chandler ("Chandler") and Lam.  D. 222-29 at 2.  Under the subject line "Acbel quality issues," Lan wrote, "I would like to draw your attention for the intensive quality issues on my key account Acbel."  Id.  He explained:  "I have had a series of meeting [sic] with CQE team to identify the root cause and improvement on subcon management, product line test coverage and material

change management." Id.  He also stated that "Acbel CEO conveyed his disappointment to me in our quality management, and expected that we would succeed in getting the improvement soon." Id.  This email provides further support for the notion that Fairchild directly communicated with AcBel in an effort to understand and resolve AcBel's product-related concerns.  Moreover, because Lan referred to AcBel as a "key account" and directly engaged with AcBel's CEO, id., this email also provides support for AcBel's contention that AcBel was Fairchild's customer.  Contact with a senior AcBel employee such as the CEO, in particular, suggests that Fairchild controlled the relationship with AcBel at a high level.  Critically, the fact that AcBel was disappointed in Fairchild's "quality management" gives rise to a reasonable inference that the relationship between Fairchild and AcBel involved more than post-purchase servicing and that AcBel expected that Fairchild control the quality of the product as it was purchased.

The possibility that Fairchild's efforts to resolve AcBel's product-related concerns were part of Fairchild's greater responsibility for the AcBel account is supported by another email.  In a March 2011 email with the subject line "KA/ LM78 die shrink project," Chandler appears to inquire into how the quality-control issues with the redesigned Voltage Regulators occurred.  D. 222-17 at 2.  Chandler writes, "I can't pin-point just where and when we missed our chance to stop this.  Seems like it was developed, sat on the shelf, and then went to market four years from the start date. I wonder what sort of design review it received once completed . . . [w]e need to fix this and make sure there are not any more lurking in the waters."  Id.  Still more, Chandler notes, "[a]t the end of the day . . . it went to market under our watch.  We have to take the blame."  Id.

Finally, in a July 18, 2011 email, Mark Norman ("Norman"), the Senior Vice President of Sales and Marketing at Fairchild, wrote to two AcBel representatives, "[r]egarding the issue Acbel is experiencing with the KA7805ERTM, Fairchild will move forward and issue a RMA for all

350K units of this devise, replacing with new product at no cost to Acbel." D. 222-19 at 2.  Norman

continued, "[t]his would satisfy Fairchild's contractual obligation regarding this issue." Id.  After

explaining that Fairchild could not commit to but would consider assisting with a field recall of

EMC products, Norman issued an apology, reiterating that "Acbel is an important customer to

Fairchild, and Fairchild would like to come to a reasonable resolution on this matter." Id.  This

email suggests that Fairchild had a practice of replacing defective products that had been sold to

AcBel and, even more fundamentally, that Fairchild considered AcBel to be Fairchild's customer

to whom Fairchild had a "contractual obligation."

Interpreted in a light most favorable to AcBel, the evidence showing that Fairchild treated

AcBel as a customer, participated in price negotiations with AcBel and resolved AcBel's concerns

regarding the defective Voltage Regulators supports a finding that AcBel was the principal as to

the contract with AcBel.  See W.R. Const. & Consulting Inc. v. Jeld-Wen, Inc., No. 01-cv-10098-

DPW, 2002 WL 31194870, at *4 (D. Mass. Sept. 20, 2002) (explaining that evidence that

defendant "was closely involved in the process leading up to the sale of the windows . . . had

repeated contact with the consumer" and "address[ed] concerns regarding delivery dates,

compatibility with storm windows and warranties" was sufficient to raise a genuine issue of

material fact as to agency theory).

As a final note, Fairchild's argument that post-purchase actions are irrelevant to

establishing privity is unavailing, D. 212 at 6, and the two cases upon which it principally relies

for this contention,  Newton v. Rockwood & Co., 378 F.2d 315 (1st Cir. 1967) and Paramount

Farms Int'l LLC v. Ventilex B.V., 500 F. App'x 586 (9th Cir. 2012), are distinguishable.  In

Newton, the First Circuit concluded that the plaintiff's claim for breach of the implied warranty

that the milking system at issue had been properly installed failed because there existed no contract

to support that implied warranty claim.  <u>Newton</u>, 378 F.2d at 318.  The plaintiff rested its warranty claim on an alleged oral contract that the defendant properly install the milking system.  <u>Id.</u> Finding no evidence to support the existence of that alleged contract, the court concluded that the oral contract did not exist and determined that, without a contract regarding the installment of the system, the breach of warranty claim regarding the installment of the system failed.  <u>Id.</u>  While the court noted in laying out the factual background of the case that the defendant made efforts to resolve the defect in the milking system, <u>id.</u> at 317, that fact was irrelevant to the court's decision on the breach of implied warranty claim.  <u>Id.</u> at 318.  Thus, <u>Newton</u> is distinguishable because here it is undisputed that there was a contract governing AcBel's purchase of the Voltage Regulators and that the issue is whether the signatory to that contract was an agent of Fairchild's for the purpose of privity required for AcBel's breach of implied warranty claim.

Similarly, in <u>Paramount Farms Int'l LLC</u>, a Ninth Circuit case applying California law, the court dismissed an implied warranty claim as legally insufficient and explained that there was no basis for privity of contract where "[the defendant] never assumed the position of [the related corporate entity], entered into a contract with [the plaintiff], nor engaged in significant 'direct dealings' with [the plaintiff] before it contracted with [the related corporate entity] to purchase [the product]."  <u>Paramount Farms Int'l LLC</u>, 500 F. App'x at 588.  Thus, while the court noted that there were no direct dealings prior to the contract, this was one of many factors considered and factors which, in totality, compelled the conclusion that there was no privity.  <u>Id.</u>  The totality of circumstances here, as discussed above, warrants a different outcome as to Fairchild's motion.

> **b.  Evidence that Fairchild Managed Synnex's Interactions with AcBel Supports the Reasonable Inference that Fairchild Was in Control of the Business Relationship with AcBel**

On this record, it is at least reasonably disputed that Synnex served as an intermediary that, acting pursuant to Fairchild's instruction, facilitated the business relationship between AcBel and Fairchild.  See Theos & Sons, Inc., 431 Mass. at 742 (explaining that an agency relationship exists where the agent acts "on behalf and for the benefit of the principal, and subject to the principal's control").  AcBel has represented that, at the time of the dealings, AcBel believed Synnex to be Fairchild's agent.  D. 221 ¶ 13.  AcBel points to emails in the record that support the reasonableness of AcBel's belief.  RFF Family P'ship, 907 F. Supp. 2d at 161 (noting that the plaintiff's belief that the third party functions strictly as an agent must be "traceable" to the principal's actions).

In a December 6, 2010 email, Monica Tung ("Tung") of AcBel wrote to another AcBel employee that "[a]fter checking, all the goods is from Synnex (Fairchild Agent) to AcBel from 2009 to now."  D. 223-25 at 2.  Tung's email was in response to an email she received on that same day that read "Please inform Fairchild to come AcBel asap."  Id.  These emails' explicit reference to Synnex as Fairchild's agent constitutes evidence of an agency relationship.  Moreover, a reasonable inference can be drawn from these emails that despite the fact that the goods "[were] from" Synnex, AcBel still communicated directly with Fairchild – a duality that supports the conclusion that Fairchild was in ultimate control of the business relationship with AcBel.

An April 13, 2012 email between Fairchild, AcBel and Synnex employees further evidences an agency relationship.  D. 223-12 at 2.  In the email, Tung of AcBel shares the notes from a meeting that occurred that same day.  Id.  Tung provided an outline that included the topic "[a]gent transfer" and listed under that topic the following line item:  "provide formal notice/letter for Synnex termination."  Id.  A reasonable fact finder might read this email to mean that AcBel, Synnex and Fairchild met in person.  Furthermore, in a reply email, Tung wrote "[w]e are still

waiting for your formal announcement and please advise asap when you will come to AcBel to discuss about the agent transfer in detail." <u>Id.</u>

Moreover, AcBel points to correspondence indicating that Fairchild provided a certain guarantee for the goods AcBel purchased through Synnex:  in one email to several AcBel and Fairchild employees, Alan Lo ("Lo") of Fairchild wrote, "we are so sorry about that these goods are not through our disti Synnex, that's why we can't help you to return or swap it."  D. 223-10 at 2-4.  While the email does not define the term "disti," a reasonable fact finder could conclude that "our disti" refers to an agency relationship between Fairchild and Synnex – the kind of relationship wherein Fairchild would facilitate returns and swaps so long as goods were purchased through Synnex.

Finally, AcBel points to a January 20, 2010 email in which Lo of Fairchild Hong Kong wrote, "[y]ou can inform Synnex sales with new price to enter more buffer PO of KA7805ETU, and ship by one time."  D. 222-23 at 3.  Even if this email involved only the Hong Kong Fairchild office, it may still be considered in combination with the rest of the evidence in the record to support the inference that Synnex generally served as an agent to Fairchild entities.  A reasonable fact finder might find that this email suggests that Fairchild had authority over price negotiations with AcBel; and Synnex, who was merely "inform[ed]" about "new price[s]" was an agent of Fairchild.  <u>See, e.g.</u>, <u>Fergus v. Ross</u>, 89 Mass. App. Ct. 528, 533 (2016) (concluding that there was sufficient support for the conclusion that the third party was acting with apparent authority as the defendant's agent where the defendant, *inter alia*, "entrusted" the agent to "carry out many steps necessary to the successful completion" of the commercial transaction).

On this record, the Court cannot conclude that a matter of undisputed fact that there is no privity between the parties when AcBel has made a colorable showing that Synnex and Fairchild

were engaged in an agent-principal relationship.  See, e.g., Nelson v. Bosley Med. Grp., P.C., No. 05-cv-1684-PET, 2007 WL 3244635, at *1 (Mass. Super. Oct. 18, 2007) (denying summary judgment on breach of contract claim premised upon agency theory where the record indicated that the defendant and third party "worked in tandem").  AcBel has at least raised a genuine issue of fact as to whether Synnex was acting for Fairchild's benefit and under Fairchild's control.  See, e.g., Harrington v. Fed. Nat'l Mortgage Ass'n, No. 14-cv-12333-MBB, 2016 WL 3561858, at *7 (D. Mass. June 27, 2016) (concluding that a genuine issue of material fact existed where evidence in the record suggested that third party served as an agent of the defendant).

For all of these reasons, a genuine issue of material fact regarding these claims remains.

### 2. AcBel Has Failed to Demonstrate a Genuine Issue of Material Fact as to Whether Piercing the Corporate Veil between Fairchild and the Corporate Subsidiaries Is Warranted

"Under Massachusetts law, corporations are generally regarded as separate from each other."  Hoffman v. Optima Sys., Inc., 683 F. Supp. 865, 870 (D. Mass. 1988).  Disregard of corporate separateness between a group of independent corporations engaged in a single enterprise is permitted only where two factors are met:  (1) the corporations failed to "make clear which corporation is taking action in a particular situation and the nature and extent of that action" or failed to "observe with care the formal barriers between the corporations" and (2) the disregard of corporate separateness is necessary to prevent gross inequity.  My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968).  The "piercing of the corporate veil [must be] necessary to defeat fraud or wrong or to prevent gross inequity."  NCR Credit Corp. v. Underground Camera, Inc., 581 F. Supp. 609, 612 (D. Mass. 1984).  "Only in those rare situations in which these two conditions exist may a court properly invoke the equitable doctrine of corporate disregard."  Id.

Even if AcBel is correct that Fairchild and the Foreign Subsidiaries failed to make clear which corporation was taking action in regards to the Voltage Regulators sold to AcBel, AcBel's argument in favor of piercing the corporate veil fails because AcBel has not made any showing that piercing the corporate veil is necessary to defeat fraud or prevent gross inequity.  See NCR Credit Corp., 581 F. Supp. at  612-13 (explaining that the court did not need to rule upon whether the corporations committed a "confused intermingling" because there was no showing of gross inequity where there was no evidence that the corporation used its subsidiary "an as instrument to perpetrate a fraud").  As to the gross inequity prong, a plaintiff must show that "the Defendant Corporations were created to perpetrate a fraud or that piercing the corporate veil is necessary to prevent gross inequity."  De La Fontaine Warehouses, Inc. v. Lang, No. 04-cv-3071-GH, 2005 WL 503721, at *2 (Mass. Super. Jan. 14, 2005).  "The 'gross inequity' that can lead to the piercing of the corporate veil typically requires some finding that the corporation engaged in misconduct through the corporate form."  Lothrop v. N. Am. Air Charter, Inc., 95 F. Supp. 3d 90, 103 (D. Mass. 2015).  Moreover, gross inequity is found where a corporate entity "escape[s] liability by limiting its presence in a state (or in the country) to undercapitalized 'subsidiaries.'"  Giuliano v. Nations Title, Inc., 938 F. Supp. 78, 82 (D. Mass. 1996), aff'd, 134 F.3d 361 (1st Cir. 1998).

AcBel has failed to address adequately this second prong.  D. 220 at 8-11.  AcBel concedes that the Foreign Subsidiaries are fully capitalized.  Hring. Tran. at 24; D. 213 ¶ 15.  AcBel has failed to identify any other way in which Fairchild used the Foreign Subsidiaries to engage in an abuse of the corporate form.  Thus, there is no triable question regarding corporate separateness. See, e.g., Dale v. H.B. Smith Co., 910 F. Supp. 14, 20 (D. Mass. 1995) (allowing summary judgment motion on claim that depended upon corporate veil piercing where plaintiff offered no evidence of, *inter alia*, thin capitalization, insolvency, absence of corporate record, siphoning away

of corporate assets);  Lothrop, 95 F. Supp. 3d at 103 (denying request to disregard corporate separateness where plaintiff "failed to allege equitable concerns sufficient to spur [the court] to consider disregarding the corporate form here").

**B.     Fairchild Is Entitled to Summary Judgment on AcBel's Design Defect and Failure to Warn Claims**

In Counts VI, VII, VIII, IX, XIV, XV, XVI and XVII, AcBel asserts claims for failure to warn and design defect based upon theories of strict liability and negligence.  D. 7 ¶¶ 137-173, 208-241.  In these claims, AcBel asserts that Fairchild sold the allegedly defective Voltage Regulators, knew that the Voltage Regulators were defective and failed to warn AcBel and EMC. Id.  Fairchild moves for summary judgment on AcBel's design defect and failure to warn claims, arguing primarily that the claims are barred by the economic loss doctrine.  D. 211; D. 212 at 18-19.

**1.     The Economic Loss Doctrine**

Fairchild argues that the redesigned and allegedly defective Voltage Regulators do not give rise to any negligence or strict liability claims because AcBel has made no showing that the Voltage Regulators caused damage to any person or property other than the product itself.  D. 212 at 15-16.  AcBel appears to contend that its claim is not barred by the economic loss doctrine because "each DAE housed a set of paired PSUs" and "[i]n certain instances, the alleged failure of a Voltage Regulator in a PSU would trigger the failure of a Voltage Regulator in a paired PSU." D. 221 ¶ 35.  In response, Fairchild argues that the PSUs and the Voltage Regulators are part of a single integrated system and so the alleged damage to the PSUs or to the other Voltage Regulator in a paired set – the only damage AcBel alleges – does not constitute damage to other property. D. 212 at 16-17.  The Court agrees with Fairchild.

The law recognizes a "meaningful distinction between tort recovery for physical injuries and warranty recovery for economic loss." Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103, 109 (1989) (citing E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871-875 (1986)).  "'When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.'"  Bay State-Spray & Provincetown S.S., Inc., 404 Mass. at 109 (quoting E. River S.S. Corp., 476 U.S. at 871).  Accordingly, the economic loss doctrine precludes plaintiffs from recovering in tort for purely economic losses that arise from the defective product.  See Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 89 (D. Mass. 1998).  Instead, to recover in tort, there must be a showing that the allegedly defective product caused personal injury or damage to property other than the product itself.  Id.

### 2. AcBel Has Failed to Produce a Genuine Issue of Material Fact Regarding whether the Voltage Regulators Damaged Persons or Other Property

AcBel argues that damage to the PSUs and the DAEs constitutes damage to property other than the product itself. D. 220 at 23.  In its statement of facts, AcBel represents that the "Voltage Regulator failures caused physical damage to PSUs, DAEs, and other components and portions of PSUs and DAEs." D. 221 ¶ 34.  In resolving the motion to dismiss, the Court determined that there were sufficient allegations of damage to survive dismissal at that juncture.  See AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc., No. 13-cv-13046-DJC, 2014 WL 4656608, at *6 (D. Mass. Sept. 12, 2014).  Even with the benefit of discovery, however, AcBel has made no colorable showing of damage other than to the product itself:  (1) AcBel has not claimed any personal injury, much less provided any evidence of personal injury; and (2) AcBel's assertions

regarding the damage the defective Voltage Regulators caused to the PSUs or to other Voltage Regulators are unavailing.

Because the PSUs and DAEs were part of the same integrated system as the Voltage Regulators, damage to the PSUs and DAEs is legally insufficient to support AcBel's negligence and strict liability claims.  "In determining whether a defective product has damaged other property, courts will look to whether the defective product was part of an integrated system." Superior Kitchen Designs, Inc. v. Valspar Indus. (U.S.A.), Inc., 263 F. Supp. 2d 140, 145 (D. Mass. 2003).  It is well-settled that "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property'" sufficient to constitute an exception to the economic loss doctrine.  Id. (alteration in original) (citing Wausau Tile, Inc. v. Cty. Concrete Corp., 226 Wis. 2d 235, 249 (1999)).  "[T]he relevant 'product' is the finished product into which the component is integrated." Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 90 (D. Mass. 1998) (citing King v. Hilton-Davis, 855 F.2d 1047, 1051 (3d Cir. 1988) and Am. Home Assur. Co. v. Major Tool & Mach., Inc., 767 F.2d 446, 447-48 (8th Cir. 1985)).  This rule is necessary because "it is difficult to imagine a scenario in which the natural consequence of an installed structural component's failure would be damage only to the structural component itself without any damage to the surrounding property." Dakota Gasification Co. v. Pascoe Bldg. Sys., a Div. of Amcord, Inc., 91 F.3d 1094, 1100 (8th Cir. 1996).

Here, it is undisputed that AcBel purchased the Voltage Regulators to install them as component parts in the PSUs.  D. 213 ¶ 25; D. 221 ¶ 25.  It is also undisputed that the PSUs were, in turn, components parts in the DAEs, which were integrated storage systems.  Id.  In light of these undisputed facts, there exists no evidence upon which the Court can treat the Voltage Regulators as a distinct product for the purposes of the economic loss doctrine.  Based upon this

record, the Voltage Regulators were a part of an integrated system because the Voltage Regulators were "purchased to be installed and to become integrated with the [PSUs and DAEs]." Sebago, Inc., 18 F. Supp. 2d at 93. Moreover, the Voltage Regulators were "a component of the [DAEs], and ha[d] no use to the plaintiffs otherwise." Id. (concluding that roof insulation was a component part of the building and so damage to the building was insufficient to avoid the economic loss doctrine).

The Voltage Regulators were, at base, component parts that were integrated into the DAE system. See, e.g., Superior Kitchen Designs, Inc., 263 F. Supp. 2d at 145 (explaining that "it [was] difficult to fathom how the . . . products consisting of stains, top coats and sealers can be characterized other than as integrated, indistinguishable components of the finished cabinets"). They fall within the category of component parts that are "so rudimentary that, if [the Court] were to hold that it is the product for economic loss rule purposes, nearly any component part would be a product and we would, as a result, effectively eviscerate the distinction between contract and tort law." Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 850 (6th Cir. 2002) (rejecting the argument that the product was strictly the defective wood and that damage to the house into which the wood was incorporated constituted "other property" for the purposes of the economic loss doctrine). Accordingly, any damage caused to the PSUs, the DAEs or other Voltage Regulators in the DAEs is not damage to "other property."

In the end, there exists no genuine issue of material fact as to whether the DAEs are a single integrated system of which the Voltage Regulators and PSUs were a component part and AcBel has made no showing of any damage to any other property or person. Therefore, the economic loss doctrine bars AcBel's failure to warn and design defect claims. Fairchild's motion for summary judgment on these claims is allowed.

### C.      Fairchild Is Entitled to Summary Judgment on AcBel's Fraud Claims

In its fraud claims, AcBel asserts that industry custom required Fairchild to change the part number on the Voltage Regulators when the Voltage Regulators were redesigned to shrink the die in 2008 and once again when the Voltage Regulators were returned to their original design.  D. 7 ¶¶ 40, 49, 103-07.  In AcBel's view, Fairchild's failure to change the part number constituted fraud and, in reasonable reliance upon the unchanged part number, AcBel incorporated Voltage Regulators containing the defects into its PSUs.  Id. ¶ 40, 49, 103-07, 110.  AcBel's chief operating officer, Tony Wan ("Wan"), asserts that AcBel was not aware of either the redesign or the decision to revert to the original design until December 1010 when EMC reported wide spread failures with the PSUs.  D. 224 ¶¶ 7-8.  In moving for summary judgment, Fairchild primarily argues that (1) even assuming that the failure to change a part number can constitute a misrepresentation, the representation did not come from Fairchild; and (2) AcBel cannot show reasonable reliance upon the unchanged part number because Synnex sent AcBel a process change notice ("PCN") regarding the redesign to the Voltage Regulators in 2008.  D. 212 at 11-12; D. 244 at 16-17.

Under Massachusetts law, a claim for fraud requires that:  (1) the defendant made a false statement of a material fact; (2) the defendant did so with knowledge of its falsity; (3) the purpose of the statement was to induce the plaintiff to act; (4) the plaintiff relied upon the statement; and (5) the reliance resulted in damage.  See Reisman v. KPMG Peat Marwick LLP, 57 Mass. App. Ct. 100, 108-09 (2003) (quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982)).  In addition, the plaintiff must show that its reliance upon the misstatement was reasonable.  See Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 81 (D. Mass. 2004) (citing Saxon Theatre Corp. of Boston v. Sage, 347 Mass. 662, 666 (1964)).

**1.    There Exists No Genuine Issue of Material Fact regarding Whether the Process Change Notification Placed AcBel on Notice of the Design Change to the Voltage Regulators**

It is undisputed that in October 2008 Synnex sent AcBel a PCN regarding the die shrink redesign to the Voltage Regulators.   D. 213 ¶ 19; D. 221 ¶ 19.   The PCN was entitled "DESIGN/PROCESS CHANGE NOTIFICATION -- FINAL."   D. 213-2 at 10.   The PCN explained at the outset that "[t]his is to inform you that a design and/or process change will be made to the following product(s)" and "[t]his notification is for your information and concurrence." Id.   The PCN described the redesign as a change from "4um/40V fab process in Bucheon, Korea" to a "1.5um/40V fab process in Bucheon, Korea." Id.   The PCN stated that "[f]unctionality and electrical characterics [sic] remain within current datasheet specifications." Id.   The PCN listed the Voltage Regulators at issue – part KA7805ERTM – as one of the affected products. Id. at 11.   In addition to supplying this information, the PCN provided AcBel a contact phone number if AcBel had "any questions concerning this change." Id. at 10.   The PCN also invited AcBel to request "data or samples" as needed "to qualify this change" and invited AcBel to view "[u]pdated process quality documentation" as needed. Id.

Based upon the record, the Court concludes that the PCN notified AcBel that the design of the Voltage Regulator was undergoing alteration.   The PCN identified the nature of the product change and the products that were affected by the change.   Indeed, AcBel's expert, Timothy C. Daun-Lindberg ("Daun-Lindberg"), concedes that AcBel received the PCN which "indicated that the VR had undergone a 'Fab Process Change . . . [f]rom . . . 4um/40V . . . [t]o . . . 1.5um/40V.'" D. 223-15 ¶ 28.   According to AcBel's expert, "[i]n layman's terms, the PCN stated that Fairchild shrunk the die of the part by reducing the circuit geometries on the die from 4um in width to 1.5um." Id.   In its briefing, AcBel acknowledges that the 2008 PCN related to the redesign of the

Voltage Regulators.  D. 220 at 23.  Thus, AcBel has acknowledged that it received the PCN, the PCN placed AcBel on notice of the fact that the design of the Voltage Regulator had been changed and placed AcBel on notice of the specific way in which the design had been changed.  The PCN also offered AcBel the contact information needed to acquire additional information regarding the redesign if AcBel remained unsure of the meaning of the PCN.  For these reasons, the PCN constituted adequate notice of the design change.

In AcBel's view, the PCN was ineffectual notice because the PCN "expressly stated that Fairchild expected to ship the redesigned Voltage Regulators within three months" and "Fairchild waited over a year to ship the redesigned Voltage Regulators."  D. 220 at 23.  To the extent that AcBel intended to argue that the PCN guaranteed that the redesigned Voltage Regulators would be shipped within three months, this argument mischaracterizes the PCN. The PCN offered three months as an estimate of the earliest date upon which Fairchild expected that it would begin shipping the redesigned Voltage Regulators.  D. 213-2 at 10.  The PCN specifically described the date offered as "[e]xpected 1st [d]evice [s]hipment [d]ate."  Id.  The plain language of the PCN left open the possibility that redesigned Voltage Regulators would continue to be shipped after the three-month window.  As AcBel's own expert recognizes, the dates in the PCN were "projected" dates.  D. 223-15 ¶ 32.  To the contrary, a "[d]efendant may not be held liable if the representation 'concerned a matter of opinion, estimate or judgment.'"  Hallmark Inst. of Photography, Inc. v. CollegeBound Network, LLC, 518 F. Supp. 2d 328, 332 (D. Mass. 2007).  Where "a statement is of a 'fundamentally predictive nature,' a defendant cannot be said to be making a representation regarding any present fact that the plaintiff can then reasonably rely on."  Id.  Because the shipping date in the PCN was an estimated date, it cannot constitute a representation upon which AcBel could have reasonably relied.  For these reasons, AcBel's argument fails.

AcBel also argues that "the 2008 PCN is no defense to the charge that Fairchild misrepresented the second change – back to the original design – because the PCN concerned only the first change." D. 220 at 22. This argument is unpersuasive because AcBel has failed to make any showing that Fairchild misrepresented the "second change" by using the same part number on the Voltage Regulators that were manufactured after the redesign was abandoned that had been assigned to the Voltage Regulators that were manufactured pre-design change. AcBel's expert, Daun-Lindberg, asserts that "[i]ndustry custom and standards require Fairchild to add a suffix to the part number of a product to designate a significant material change such as die-shrink." D. 223-15 ¶ 71. Even assuming the truth of that assertion, Daun-Lindberg has only represented that distinct part numbers are required where there is a significant material change between the products. Because it is undisputed that the Voltage Regulator was reverted back to its original design after the die shrink redesign was abandoned, D. 213 ¶ 21; D. 221 ¶ 21, there is no evidence of a significant material change between the Voltage Regulators that were manufactured before the redesign and the Voltage Regulators that were manufactured once the redesign was abandoned. It is undisputed that those two sets of Voltage Regulators had the same design. D. 213 ¶ 21; D. 221 ¶ 21. That is, the Voltage Regulators were returned to their original design and so labeling them with the original part number was not a false statement even under AcBel's representation of the industry custom. Thus, the failure to change the part number when "the second change" was made does not amount to a misrepresentation.

### 2. There Exists No Genuine Issue of Material Fact regarding Whether AcBel's Reliance upon the Unchanged Part Number Was Reasonable

Even assuming that the unchanged part number constituted a misrepresentation and that the misrepresentation can be ascribed to Fairchild, AcBel's reliance upon it was not reasonable because AcBel had already received the PCN which stated that there had been a design change to

the Voltage Regulators.  To establish a claim for fraud, a plaintiff must show that its reliance upon the alleged misstatement was "reasonable under the circumstances."  Rodi v. S. New England Sch. of Law, 532 F.3d 11, 15 (1st Cir. 2008) (citation omitted).   "Although the reasonableness of a party's reliance is ordinarily a question of fact for the jury if no reasonable jury could find the party's reliance reasonable a court may grant summary judgment."  Id. (citation omitted).  Where a plaintiff receives multiple statements or notices regarding a matter and those statements conflict with each other, reliance upon either statement without further inquiry is, as a matter of law, unreasonable.  See Trifiro v. N.Y. Life Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988).  "Confronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying."  Id.  Faced with conflicting statements, a "reasonable person does not gamble."  Id.  Instead, a reasonable person "suspends judgment until further evidence is obtained." Id. at 33-34.

Because the PCN placed AcBel on notice that the Voltage Regulators were being altered to shrink the die, AcBel's reliance upon the unchanged part number was unreasonable as a matter of law.  To the extent that AcBel understood the unchanged part number to constitute a statement that the design of the Voltage Regulators had not been altered, that statement was in conflict with the express information provided in the PCN.  By definition, such explicitly conflicting statements "engender[] doubt."  Id. at 34.  AcBel's reliance upon "a statement the veracity of which [AcBel] should doubt is unreasonable."  Id.

AcBel had sufficient knowledge to recognize that it should not rely upon the part number and at the very least had sufficient information to trigger a duty to inquire.  See Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp. 2d 236, 242–43 (D. Mass. 1999) (stating that "[i]t is settled law that a person who is confronted with inconsistent or contradictory

representations may not reasonably rely on one side of the controversy without attempting to resolve the inconsistency or contradiction"). There is no evidence in the record that AcBel sought to clarify whether the information in the PCN was nullified by the allegedly unchanged part number. Thus, AcBel's reliance was unreasonable. See, e.g., Clinical Tech., Inc. v. Covidien Sales, LLC, No. 14-cv-12169-PBS, 2016 WL 3360481, at *13 (D. Mass. June 16, 2016) (explaining that the "obvious" conflict between the two statements the plaintiff had received rendered plaintiff's reliance upon one of the statements unreasonable as a matter of law); Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988) (concluding that reliance upon a statement was unreasonable as a matter of law where that statement was in direct conflict with another statement the plaintiff received); Massachusetts Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 243 (explaining that "[r]eliance cannot be deemed reasonable . . . when minimal investigation would have revealed the truth").

Accordingly, even if it was, as AcBel contends, industry practice to change the part number when there was a material change to the product design and even if the failure to change the part number can be ascribed to Fairchild, the alleged failure to change the part number does not give rise to a fraud claim because AcBel's reliance upon that statement was unreasonable. See Massachusetts Laborers' Health & Welfare Fund, 62 F. Supp. 2d at 243 (explaining that "[s]ince the reasonableness of its reliance is part of the plaintiff's case, the deficiency is fatal to the claims"); Nei v. Burley, 388 Mass. 307, 311 (1983) (rejecting fraud claim and explaining that buyer who had been informed of the existence of excessive water could not have relied upon statement to the contrary or seller's alleged silence). For this reason, Fairchild is entitled to summary judgment on this claim.

### D.      AcBel's Fraudulent Omission and Negligent Misrepresentation Claims

Fairchild moves for summary judgment on AcBel's fraudulent omission (Count IV) and negligent misrepresentation claims (Count V).  D. 211.  AcBel bases both its fraudulent omission and negligent misrepresentation claims upon Fairchild's failure to disclose that the Voltage Regulator had been redesigned, that the redesigned Voltage Regulators were defective and that the Voltage Regulators were returned to their original design.  D. 220 at 20.

### 1.    Fairchild Is Entitled to Summary Judgment on AcBel's Fraudulent Omission Claim

The standard required to demonstrate a claim of fraud by omission necessarily retains the common-law elements of fraud.  See JSB Industries, Inc. v. Nexus Payroll Services, Inc., 463 F.Supp.2d 103, 107 (D. Mass. 2006).  That is, AcBel must demonstrate that Fairchild made " a false representation  of material fact  [here,  an  omission],  with knowledge of its falsity,  for the purpose of inducing the plaintiff[    ] to act on     this representation,     that     the plaintiff[ ] reasonably relied on the representation as true, and [it] acted upon it to [its] damage." Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 471 (2009); see Hurley v. Federal Deposit Ins. Corp., 719 F. Supp. 27, 33 (D. Mass. 1989) (noting that "[r]eliance on claimed misrepresentations and omissions is, of course, a necessary element of . . . common law fraud claims").  Additionally, to prevail on a claim for fraud by omission, a plaintiff must establish (1) concealment of material information; and (2) a duty requiring disclosure.  See JSB Indus., Inc., 463 F. Supp. 2d at 107.   Although AcBel devotes a fair amount of attention to arguing that Fairchild had knew of the defective nature of the redesigned Voltage Regulators and the return to the original design and failed to disclose it, which Fairchild disputes, D. 244 at 18, this fraud claim fail for the same as the previous fraud claim, as even assuming *arguendo* there remains any material issue of fact as to Fairchild's knowledge or its duty to disclose to AcBel, any reliance by AcBel was not reasonable as discussed above and below.

2.     **Fairchild Is Also Entitled to Summary Judgment on AcBel's Negligent Misrepresentation Claim**

To prevail on a claim for negligent misrepresentation, a plaintiff must prove that (1) the defendant provided false information in the course of his business; (2) the defendant did so without exercising reasonable care; and (3) plaintiff's justifiable reliance upon the false statement resulted in pecuniary loss.  See Nota Const. Corp. v. Keyes Assocs., Inc., 45 Mass. App. Ct. 15, 19-20 (1998) (citing Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 587 (1996)).  "[N]egligent misrepresentation 'does not require a showing that the defendant even knew that the statements made were false or that the defendant actually intended to deceive the plaintiff.'"  Amorim Holding Financeria, S.G.P.S., S.A. v. C.P. Baker & Co. Ltd., 53 F. Supp. 3d 279, 300 (D. Mass. 2014). "[T]o survive summary judgment on its negligent misrepresentation claim, plaintiffs must 'produce specific facts, in suitable evidentiary form,' supporting each of the . . . elements of negligent misrepresentation."  Robert E. Ricciardelli Carpet Serv., Inc. v. Home Depot U.S.A., Inc., 679 F. Supp. 2d 192, 210 (D. Mass. 2010) (alteration in original) (citation omitted).

Fairchild contends that AcBel's negligent misrepresentation claim fails because AcBel "cannot establish the[] essential elements" of a negligent misrepresentation claim, specifically AcBel cannot show that it reasonably relied upon any alleged misrepresentation.  D. 212 at 13; D. 244 at 17.  The Court agrees:  AcBel's claim lacks an affirmative misrepresentation and any reasonable reliance.  The amended complaint alleges that AcBel's negligent misrepresentation claim arises from Fairchild's failure to change the part number when the Voltage Regulators were redesigned, D. 7 ¶ 125, Fairchild's failure to change the part number when the Voltage Regulators were returned to their original design, id. ¶ 127, and Fairchild's failure to disclose the defect in the redesigned Voltage Regulators, id. ¶ 133.  In its briefing, AcBel reiterates that it "bases its omission

and misrepresentation claims on Fairchild's failure to notify AcBel of the product defect or the design change Fairchild made to the Voltage Regulator."  D. 220 at 20.

To the extent that AcBel premises this claim upon Fairchild's alleged failure to disclose the defect, the claim fails because AcBel points to no affirmative statement or presentation of false information regarding the functionality of the redesigned Voltage Regulators in humid situations – the specific defect alleged here.  D. 221 ¶ 21.  "[M]ere nondisclosure generally will not support any cause of action for misrepresentation."[4]  Logan Equip. Corp. v. Simon Aerials, Inc., 736 F. Supp. 1188, 1200 (D. Mass. 1990).  In the absence of an affirmative statement, AcBel's claim for negligent misrepresentation premised upon the alleged failure to disclose the defect in the Voltage Regulators collapses into AcBel's fraudulent omission claim.  See Smith v. Zipcar, Inc., 125 F. Supp. 3d 340, 344 (D. Mass. 2015) (stating that "[i]n the absence of an affirmative misrepresentation, an action for fraud requires 'both concealment of material information and a duty requiring disclosure'").

To the extent AcBel contends that Fairchild's failure to change the part number constituted a negligent misrepresentation, the claim fails for the additional reason that the PCN, D. 213-2 at 10, notified AcBel of the design change.  As a result, and as discussed above, AcBel could not have reasonably relied upon the unchanged part number.  See Logan Equip. Corp. v. Simon

---

[4]  The exception to the bar on negligent misrepresentation claims based upon nondisclosure is that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  Kiluk v. Select Portfolio Servicing, Inc., No. 11-cv-10731-FDS, 2011 WL 8844639, at *4 (D. Mass. Dec. 19, 2011) (internal quotation marks omitted) (citing Augat, Inc. v. Collier, No. 92-cv-12165-RCL, 1996 WL 110076, at *14 (D. Mass. Feb. 8, 1996)).  AcBel has neither invoked this exception nor more generally pleaded that AcBel relied upon a partial truth that Fairchild offered regarding the defect.  Thus, the exception is inapplicable.

<u>Aerials, Inc.</u>, 736 F. Supp. at 1200, 1207.  AcBel has failed to raise a genuine issue of material fact regarding whether the defendant negligently provided false information upon which the plaintiff could reasonably rely.  For these reasons, Fairchild is entitled to summary judgment on this claim.

**E.     Fairchild Is Entitled to Summary Judgment on AcBel's Mass. Gen. L. c. 93A Claim**

Fairchild moves for summary judgment on AcBel's Mass. Gen. L. c. 93A claim (Counts X and XVIII).  D. 211.  Fairchild contends that AcBel's Mass. Gen. L. c. 93A claim fails because (1) the allegedly deceptive actions did not occur "primarily and substantially within" Massachusetts; and (2) there was no transaction between Fairchild and either AcBel or EMC.  D. 212 at 19.

The parties agree that Mass. Gen. L. c. 93A, Section 11 requires that the allegedly deceptive actions occurred primarily and substantially in Massachusetts.  D. 212 at 19; D. 220 at 24.  The determination of whether the alleged misconduct substantially occurred in Massachusetts "is not a determination that can be reduced to any precise formula."  <u>Pine Polly, Inc. v. Integrated Packaging Films IPF, Inc.</u>, No. 13-cv-11302-NMG, 2014 WL 1203106, at *7 (D. Mass. Mar. 19, 2014) (citing <u>Kuwaiti Danish Computer Co. v. Digital Equip. Corp.</u>, 438 Mass. 459 (2003).  Instead, the "key question is whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."  <u>Id.</u> (citation and internal quotation marks omitted).

Now based upon a fully developed record, it is clear that there is no evidence of any unfair or deceptive conduct that occurred in Massachusetts.  The core of AcBel's Mass. Gen. L. c. 93A claim is that Fairchild allegedly concealed and failed to disclose a known design defect in the Voltage Regulators and breached the implied or express warranties by selling the defective Voltage Regulators.  D. 7 ¶¶ 249-55.  It is undisputed, however, that no Massachusetts-based employee of any Fairchild entity had any substantive involvement with the Voltage Regulators.  D. 213 ¶ 33;

D. 221 ¶ 33.  Moreover, Fairchild has asserted that the redesign occurred in China and the testing occurred in South Korea, D. 213 ¶¶ 12, 17, and AcBel has failed to challenge those assertions with any evidence.  D. 221 ¶¶ 12, 17; D. 220 at 24-26.  Fairchild has also asserted that to the extent any U.S. based Fairchild employees were involved, those employees lived and worked in Maine, California, Florida and Texas, D. 213 ¶ 32, and AcBel has failed to challenge that assertion. D. 221 ¶ 32; D. 220 at 24-26.  In sum, AcBel does not point to any evidence in the record that demonstrates that the allegedly unfair and deceptive acts occurred in Massachusetts.  D. 220 at 24-26.

AcBel still contends that the requirement that acts occur primarily and substantially in Massachusetts is satisfied "because of the damage [AcBel] suffered within Massachusetts."  Id. at 24.  It is well-established, however, that the fact that the injury occurred in Massachusetts is, without more, legally insufficient to support a claim for violation of Mass. Gen. L. c. 93A.  "[W]hen 'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the Commonwealth, there can be no Chapter 93A liability."  Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 236 (1st Cir. 2003) (quoting Kuwaiti Danish Computer Co., 438 Mass. at 475).  AcBel also points to the affidavit of Tony Wan ("Wan"), Chief Operating Officer of AcBel.  D. 224.  Wan asserts that AcBel suffered damages in Massachusetts, the defective Voltage Regulators were sent by EMC to Massachusetts and Fairchild shipped the defective Voltage Regulators to AcBel in Massachusetts for troubleshooting.  Id. ¶¶ 15-16.  Even if true, none of these contentions are the deceptive and unfair conduct that AcBel alleges as the basis of this Mass. Gen. L. c. 93A claim.  See AECOM Tech. Servs. Inc. v. Mallinckrodt LLC, 117 F. Supp. 3d 98, 106 (D. Mass. 2015) (noting that a defendant's contacts with Massachusetts that are

neither unfair nor deceptive are not relevant to determining whether the deceptive conduct substantially occurred in Massachusetts).

Despite the benefit of discovery, AcBel has failed to make any showing of deceptive and unfair conduct that substantially occurred in Massachusetts.  Accordingly, Fairchild is entitled to summary judgment on this claim.[5]  See e.g., Skyhook Wireless, Inc. v. Google Inc., 86 Mass. App. Ct. 611, 623 (2014) (granting summary judgment on Mass. Gen. L. c. 93A claim even though Massachusetts was the situs of revenue lost because there was no showing that any deceptive conduct occurred in Massachusetts); Pine Polly, Inc., 2014 WL 1203106, at *8 (dismissing Mass. Gen. L. c. 93A claim where "there [was] little indication that the unfair and deceptive practices took place primarily in Massachusetts").  Having reached this conclusion, the Court does not need to address the question of whether Fairchild engaged in a commercial transaction with AcBel or EMC.  See Skyhook Wireless, Inc., 86 Mass. App. Ct. at 623 (dismissing Mass. Gen. L. c. 93A claim based upon failure to show that deceptive acts substantially occurred in Massachusetts without analyzing other elements of the claim).  Accordingly, Fairchild is entitled to summary judgment on AcBel's Mass. Gen. L. c. 93A claim.[6]

## VI.    Conclusion

For the foregoing reasons, the Court DENIES in part and ALLOWS in part Fairchild's motion for summary judgment. D. 211.  Accordingly, Counts I, II, XII and XIII shall proceed, but the other claims are dismissed.  Because the Court has not relied upon any references to settlement

---

[5]  Moreover, to the extent that AcBel's Mass. Gen. L. c. 93A claim is a negligence claim, it is also barred by the economic loss doctrine, as discussed above.  See Hooper v. Davis-Standard Corp., 482 F. Supp. 2d 157, 159 (D. Mass. 2007).

[6] As a final note, any belated request for discovery by AcBel fails as AcBel has not made a sufficient showing for same under Fed. R. Civ. P. 56(d).

agreements and negotiations in reaching its decision, Fairchild's motion to strike references to settlement agreements and negotiation is DENIED as moot.  D. 246.  Similarly, because the Court does not rely upon any legal conclusions offered by Jesse Conan in his declaration, D. 222, Fairchild's motion to strike the declaration is DENIED as moot, D. 245, as is Fairchild's motion for leave to file a reply brief regarding this motion.  D. 259.

   **So Ordered.**

              <u>/s/ Denise J. Casper</u>
              United States District Judge